698 F.2d 888
 Patrick W. SIMMONS and Jack O. Black, Petitioners,
v.
UNITED STATES of America and Interstate Commerce Commission,
Respondents.
The Baltimore and Ohio Railway Company, Intervening Respondent.
 No. 82-1153.
 United States Court of Appeals,
Seventh Circuit.
 Argued Sept. 17, 1982.
Decided Jan. 28, 1983.
Rehearing Denied March 10, 1983.
 
 Gordon P. MacDougall, Washington, D.C., for petitioners.
 Sidney L. Strickland, Jr., I.C.C., Washington, D.C., for respondents.
 Peter J. Shudtz, Cleveland, Ohio, for intervening respondent.
 Before CUMMINGS, Chief Judge, PELL, Circuit Judge, and DUMBAULD,* Senior District Judge.
 PELL, Circuit Judge.
 
 
 1
 We are presented with a challenge to an order of the Interstate Commerce Commission (ICC) granting the application of the Baltimore & Ohio Railroad (B & O) to abandon a section of track between Flora, Illinois and Sangamon Junction, Illinois (Flora line). The decision of the ICC followed our remand in the case in a decision holding the Commission's earlier approval of the abandonment application arbitrary and capricious. Illinois v. United States, 666 F.2d 1066 (7th Cir.1981).
 
 
 2
 This case comes to us in an unusual posture. Six parties had petitioned for review of the Commission's order--Illinois, the Illinois Commerce Commission, the Illinois Department of Transportation, the B & O (Chessie) Concerned Citizens Committee, Patrick W. Simmons, who is the Illinois Legislative Director for the United Transportation Union, and Jack O. Black, who is the Indiana Legislative Director for the United Transportation Union. Three days before oral argument, all petitioners except the labor representatives moved to withdraw from the petition. The moving parties announced that they had reached an agreement whereby B & O would sell the Flora line to the Prairie Trunk Railway, which would continue to operate the line if this court approved the abandonment.[1] We granted the motion to withdraw. The two labor representatives proceeded with oral argument. They urged this court to remand the case to the ICC to determine what impact the agreement would have on B & O employees.
 
 
 3
 A result of the withdrawal of all parties except the labor representatives is that it is unclear what the exact interest of the remaining parties in opposing the abandonment is. Instead of filing their own briefs, they joined in the briefs of the other parties, which made no mention of a possible impact on the workers by the abandonment. Despite the somewhat bizarre deserted ship situation in the present posture of the litigation, because the labor parties did join the briefs of the other petitioners notwithstanding that there may have been some differences of motivation for opposing abandonment, we shall address all of the issues raised in the briefs.
 
 
 4
 Petitioners present six issues on this petition for review. First, they challenge the fairness of the procedures employed by the Commission in the remanded case. Second, they argue that the ICC arbitrarily and capriciously determined that the Flora line incurred a deficit in the years 1974-1980. Third, they object to the Commission's consideration of opportunity costs incurred by the railroad. Fourth, they contend that the Commission's consideration of traffic prospects on the line was arbitrary and capricious. Fifth, they contend that the ICC improperly evaluated the evidence relating to the merger of the Chessie System and the Family Lines railroads (CSX merger). Sixth, they challenge as arbitrary and capricious the Commission's determination that adequate alternative transportation is available for shippers on the line.
 
 I. FACTS
 
 5
 On March 18, 1975, B & O applied for a certificate of public convenience and necessity permitting the railroad to abandon the 103.29-mile Flora line. Several parties opposed the application, and the ICC, on October 27, 1976, referred the application to an administrative law judge (ALJ) for a hearing. On November 11, 1977, the ALJ denied the application in an initial decision, holding that B & O had failed to show that the public convenience and necessity permitted the abandonment. B & O appealed.
 
 
 6
 On June 13, 1978, Division I of the ICC reversed the ALJ and voted to grant the application. Baltimore & Ohio Railroad Abandonment, 354 I.C.C. 798 (1978). Petitioners filed for review in this court, but the ICC requested and received a remand from this court to correct possible material error in the Division I decision. On March 3, 1980, after taking supplementary evidence, the Commission affirmed the Division I decision allowing the abandonment. 360 I.C.C. 681 (1980). Petitioners filed for review in this court.
 
 
 7
 On January 20, 1981, this court vacated the decision of the ICC because of procedural unfairness and because the Commission's decision on the merits was arbitrary and capricious. Illinois v. United States, 666 F.2d 1066 (7th Cir.1981). The court held that, although it was proper for the ICC to request and accept supplementary evidence, id. at 1070-71, the Commission improperly denied petitioners the right to cross-examine B & O witnesses with regard to the railroad's new evidence, id. at 1082-83. The court said that the Commission's conclusion that the railroad's maintenance figures were reasonable was arbitrary and capricious. Id. at 1077. The court said that the Commission acted arbitrarily and capriciously in not addressing petitioners' serious challenges to the representativeness of financial figures for the years following the filing of the abandonment petition. Id. at 1079. The court also held that the Commission's findings with regard to future traffic and alternative transportation were arbitrary and capricious. Id. at 1080. In addition, the court directed that the Commission on remand consider the impact of the CSX merger. Id. at 1081.
 
 
 8
 On March 17, 1981, the Commission reopened the proceedings and gave B & O thirty days to file revised evidence in the form of verified statements. The Commission gave petitioners twenty-two additional days (until May 8) to file reply verified statements. The Commission set the hearing for May 19.
 
 
 9
 On March 27, petitioners requested that they not be required to submit reply verified statements until after they had cross-examined B & O's witnesses and also asked that public witnesses be allowed to testify. On April 27, the Commission denied the deferral request on the ground that it wanted to avoid delay in the proceedings. The Commission further ruled that it would not require the ALJ to allow public witnesses to testify, but would leave the matter to his discretion. The ALJ did allow one witness for petitioners to testify.
 
 
 10
 By telegram on April 29, petitioners asked for a thirty-day extension to file verified statements and a thirty-day postponement of the hearing, but the Commission denied the requests. On May 7, the Illinois Department of Transportation and the B & O (Chessie) Concerned Citizens Committee informed the ICC that they would be unable to meet the May 8 deadline for filing reply verified statements. The labor representatives timely filed two statements. The petitioners filed several briefs after the May 19-20 hearing, as the Commission had invited the parties to do in its April 27 decision.
 
 
 11
 On January 2, 1982, the ICC, with one Commissioner dissenting, issued a decision granting the abandonment. The Commission rejected the claims of unfair procedures, defending its refusal to grant a thirty-day extension by citing budget limitations and its desire to avoid delay. The ICC held that petitioners did not show that B & O intended to discourage traffic on the line and rejected the claims that postapplication evidence was inherently unrepresentative of normal operations on the line. The Commission stated that no significant future traffic increases were likely and held that there were adequate alternative means of transportation for shippers. As an additional factor, the Commission noted that B & O was incurring a large opportunity cost in having to continue operating the line; the Commission emphasized, however, that it would have granted the application even without a consideration of opportunity cost.
 
 
 12
 On January 27, 1982, petitioners filed a petition to reopen on the grounds of new evidence relating to the impact of the CSX merger. The Commission denied the petition on April 21, 1982. This petition for review followed.
 
 II. PROCEDURAL CHALLENGES
 
 13
 The role of courts in reviewing agency procedures is narrow. "Absent constitutional constraints or extremely compelling circumstances the 'administrative agencies "should be free to fashion their own rules of procedure and to pursue methods of inquiry capable of permitting them to discharge their multitudinous duties." ' " Vermont Yankee Nuclear Power Corp. v. Natural Resources Defense Council, Inc., 435 U.S. 519, 543, 98 S.Ct. 1197, 1211, 55 L.Ed.2d 460 (1978) (quoting FCC v. Schreiber, 381 U.S. 279, 290, 85 S.Ct. 1459, 1467, 14 L.Ed.2d 383 (1965) (quoting FCC v. Pottsville Broadcasting Co., 309 U.S. 134, 143, 60 S.Ct. 437, 441, 84 L.Ed. 656 (1940) (footnote omitted))); see Illinois v. United States, 666 F.2d 1066, 1082 (7th Cir.1981).
 
 
 14
 Petitioners object to the Commission's refusal to grant their request for a thirty-day extension of time in which to file statements in response to B & O's new evidence. They assert that the twenty-two-day period[2] in which to respond was inadequate to analyze and respond to the complicated B & O evidence because of the need to hire experts to examine the evidence.
 
 
 15
 We find no compelling circumstances requiring reversal because of the refusal to grant an extension. This was not a new case, but rather was the same case in which petitioners had participated since 1975. They were thoroughly acquainted with the issues if not with the precise new evidence presented. Petitioners had thirty days in which to prepare evidence in advance of B & O's new presentation and twenty-two days after that to respond. Furthermore, the Commission invited the parties to submit posthearing briefs in which to address issues raised at the hearing. Although the Commission could have been more generous with its deadlines, the period was not so short under the circumstances that petitioners were treated unfairly.
 
 
 16
 It is not dispositive, as petitioners suggest it is, that B & O did not object to the extension of time. Parties cannot control an agency's docket or procedures through agreement among themselves. We also note that an agency is not precluded from trying to expedite a case simply because the proceeding has continued over a long period. There is a need to end agency proceedings at some point and, as the Commission noted, budgets are limited.
 
 
 17
 Petitioners also argue that the Commission improperly refused to postpone the hearing date even though it knew that several of petitioners' attorneys were committed to appear for oral argument before the Fifth Circuit on the same day. We find no unfairness. The petitioners knew of the potential conflict when the hearing date was set on March 17, 1981, and should not have waited until April 29 to ask the Commission to change the hearing date. The Commission rightly held that petitioners should have shown they made some effort to change the Fifth Circuit commitment before claiming necessity.
 
 
 18
 Finally, petitioners contend it was improper for the Commission to have declined to require the ALJ to hear oral opposition testimony upon remand, having allowed it in the prior proceeding. This claim is without merit. In Illinois v. United States we required only that petitioners be allowed to cross-examine B & O's witnesses, and petitioners were allowed to do so. The ALJ in fact did allow one witness for petitioners to testify at the hearing. We required no more, and indeed emphasized that our decision to require cross-examination was narrow and based on the "unique" factors present in the case. 666 F.2d at 1083.
 
 
 19
 Furthermore, an agency need not conduct an oral hearing in every proceeding, FCC v. WJR, 337 U.S. 265, 276, 69 S.Ct. 1097, 1103-04, 93 L.Ed. 1353 (1949); Illinois v. United States, 666 F.2d at 1082, although it may be required to allow cross-examination because of its particularly important role in establishing truth, id. at 1083. The Commission was not required to allow witnesses to testify upon remand simply because it allowed such testimony in an earlier phase of the case.
 
 III. STANDARD OF REVIEW
 
 20
 Under the provisions of 49 U.S.C. Sec. 10903(a), a railroad may abandon any part of its lines only if the ICC "finds that the present or future public convenience and necessity require or permit the abandonment." The railroad bears the burden of showing that the present or future public convenience and necessity require or permit the abandonment. Id. Sec. 10904(d)(1).
 
 
 21
 As was the situation when this case was last before us, see Illinois v. United States, 666 F.2d 1066, 1072 (7th Cir.1981),[3] neither side disputes the applicability of the arbitrary and capricious standard of review. Therefore we shall apply that standard. The scope of review accordingly is narrow; the role of the reviewing court is to " 'consider whether the [agency's] decision was based on a consideration of the relevant factors and whether there has been a clear error of judgment.' " Bowman Transportation, Inc. v. Arkansas-Best Freight System, Inc., 419 U.S. 281, 285, 95 S.Ct. 438, 442, 42 L.Ed.2d 447 (1974) (quoting Citizens to Preserve Overton Park, Inc. v. Volpe, 401 U.S. 402, 416, 91 S.Ct. 814, 824, 28 L.Ed.2d 136 (1971)).
 
 IV. PAST PROFITABILITY OF THE LINE
 
 22
 The fundamental contested issue in this case has always been whether the Flora line has been and will continue to be operated at a financial loss. See Illinois v. United States, 666 F.2d 1066, 1075 (7th Cir.1981). Petitioners contend that the railroad incurred no deficit on the line prior to the filing of the abandonment application and therefore that abandonment never should have been sought. They claim that evidence of postapplication losses should be disregarded because it is inherently unrepresentative of normal operations on the line.
 
 
 23
 Petitioners assert that B & O enjoyed profits on the Flora line for 1974 and 1975, the two preapplication years for which evidence is in the record. In his 1977 initial decision, the ALJ concluded that there was a net profit of $2545 on the line in 1974 and the Commission, in its 1980 decision, adopted a profit figure of $71,563 for 1975. In its January 1982 decision, however, the ICC listed a Flora line deficit of $37,039 in 1974 and $66,762 in 1975, based upon what it said was updated data from the railroad. Petitioners claim that the ICC acted arbitrarily and capriciously in accepting these deficit figures without explaining why it was rejecting the profit figures it had accepted earlier.
 
 
 24
 In Lehigh Valley Railroad Abandonment, 338 I.C.C. 793, 800 (1972), the Commission stated that "[w]henever it is found that two railroads exist as part of a railroad 'system' or 'family' the public interest dictates that for the purposes of analyzing financial data pertaining to a proposed abandonment by one, the financial effect on the other must be taken into consideration." Petitioners speculate and we think it is clear that what the Commission was doing was not considering net family line income in deriving its updated figures.
 
 
 25
 Petitioners construe Lehigh Valley more strictly than is warranted, however. Requiring a consideration of the railroad family factor does not mean that the actual revenue of the line cannot be considered in isolation. Thus we find no fault with the ICC's figures because the Commission stated that these figures were revenues and avoidable costs for the line. There is no reason why the Commission cannot list or examine the actual figures for the line, because the line's actual profits or losses are the most important pieces of information in an abandonment proceeding.
 
 
 26
 Nevertheless, we agree with petitioners that the Commission should have considered family line income. Even if one adjusts the figures by the approximately $90,000 family line income in 1975, however, the line's profit margin is so small as to be nearly insignificant. The gain in 1974 was merely $2454 and, in 1975, either $23,835 or $72,000, depending upon whether one adjusts the Commission's updated figures or the earlier figures. These amounts are trivial in comparison to the large deficits from 1976 to 1980, ranging to more than $700,000. That a line shows a slight profit does not preclude a railroad from abandoning it, especially when large rehabilitation expenses are necessary. Maine Department of Transportation v. ICC, 587 F.2d 541, 543 (1st Cir.1978); Baltimore & Ohio Railroad Abandonment, 342 I.C.C. 751, 753 (1970); Northern Pacific Railway Abandonment, 342 I.C.C. 1, 6 (1970). Thus we hold that the 1974-1975 figures are not inconsistent with B & O's abandonment application and do not render the Commission's approval of the abandonment arbitrary and capricious.
 
 
 27
 Petitioners do not dispute that B & O suffered losses on the Flora line in the postapplication years. Rather, they contend that the financial evidence for those years is inherently nonrepresentative of normal operations precisely because it is postapplication evidence. The Commission, in its 1980 decision, failed to mention the nonrepresentativeness issue. We termed the failure to consider such a "vital and serious" challenge arbitrary and capricious. Illinois, 666 F.2d at 1079. Petitioners first argue that 49 C.F.R. Sec. 1121.32(c), (d)(2), (d)(4), (d)(5), which require a railroad to submit operating data for the two years prior to the filing of an abandonment application, imply that postapplication evidence should not be used. Second, they argue that the losses for the years in question are directly related to a major track rehabilitation project undertaken to cure the defects of long-deferred maintenance, and hence are expenses that should be discounted.
 
 
 28
 This court has held that the two-year evidence regulation does not bar the Commission from accepting and considering more recent, postapplication evidence. The reopening of a hearing to take new evidence "is a matter entrusted to an agency's broad discretion." Illinois, 666 F.2d at 1071.
 
 
 29
 As for the claim that the postapplication evidence was inherently nonrepresentative because of earlier deferral of maintenance, we agree with the Commission that it was not. The ICC stated that the evidence was not inherently nonrepresentative because, first, there was no evidence of deliberate downgrading of the line; second, the deferral of maintenance was justified by the financial condition of the line; third, the postapplication maintenance expenditures were necessary to keep the line operative; and, fourth, a railroad might never be able to abandon a losing line if a rule of per se unrepresentativeness were adopted.
 
 
 30
 These explanations adequately address our concerns in Illinois; the Commission's explanations need not fully satisfy petitioners to be legally sufficient. "While it is true that the ICC is obliged adequately to address the evidence presented by one protesting an abandonment, ... the requirement cannot be carried beyond any reasonable necessity." International Minerals & Chemical Corp. v. ICC, 656 F.2d 251, 261 (7th Cir.1981).
 
 
 31
 Evidence of postapplication losses should not be considered unreliable per se; rather, the evidence should be evaluated with other evidence. A protestant could establish that the evidence is unrepresentative by showing that the railroad intended to downgrade the line, which entails ascertaining "whether certain actions by a carrier have been taken to stifle a potentially profitable service or whether the action represents an effort to maintain a marginal service for as long as is reasonable." Missouri-Kansas-Texas Railroad Abandonment, 338 I.C.C. 728, 745 (1971).
 
 
 32
 To show that the line was intentionally downgraded, petitioners contend that the large maintenance cost incurred on the line in the years 1976-1980 and the need for $7,751,081 in rehabilitation of the line were due to improperly deferred maintenance on the line. Because the conditions for proper deferral of maintenance were not present when deferral was begun, they argue, the maintenance expenses should be discounted entirely. Specifically, petitioners state that there is no evidence showing the financial condition of the line for the ten to fifteen years before the application was filed, the time when one B & O witness testified that he believed deferral began. In fact, petitioners say, looking at the earliest evidence available--1974-1975--shows that the line was profitable and thus that deferral was improper. Petitioners claim that the deferral, instead of being justified by economic necessity, was an attempt to downgrade the line so that the railroad could later inflate its maintenance and rehabilitation costs to support its abandonment claim.
 
 
 33
 As an initial matter, we reject petitioners' claim that rehabilitation costs are relevant to an abandonment case only where the rehabilitation costs are occasioned by events wholly beyond the control of the railroad. Increased rehabilitation costs may be the result of proper deferral of maintenance. In International Minerals & Chemical Corp. v. ICC, 656 F.2d 251 (7th Cir.1981), we upheld the ICC's consideration of rehabilitation costs that were made larger by deferral of maintenance that we held was justified by the line's unprofitability. Id. at 260. Rehabilitation costs are not necessarily beyond the railroad's control because they may result from a justified decision to defer, nor are they less valid as a result.
 
 
 34
 Concerning the claim that the lack of financial data for the time when deferral allegedly began makes the grant of abandonment improper, we believe that it would be manifestly unfair to the railroad to deny the abandonment on this ground. It appears that petitioners never raised this issue prior to this appeal except in a single question to one B & O witness, who said that he thought that deferral had begun ten to fifteen years earlier. Petitioners do not claim that they raised the significance of that fact prior to this appeal. If they had raised it, B & O would have had an opportunity to show the line's financial situation at the time of the deferral of maintenance. Although B & O does have the burden of proof in establishing that a line may be abandoned, 49 U.S.C. Sec. 10904(d)(1), the railroad is not required to rebut challenges to its case that are not made prior to appeal. Accordingly, we will consider the deferral of maintenance as it is justified by the financial information available, beginning in 1974.
 
 
 35
 We hold that the Commission properly decided that the deferral of maintenance was justified by the financial state of the line. This is true whichever figures we accept, either the Commission's determination of deficit operations or petitioners' figures of marginal profits for 1974-1975. The Flora line was at best marginally profitable and may have been operating at a deficit; thus, deferral of maintenance was proper. There is little doubt that the line would have had a substantial deficit were it not for the deferral of maintenance, because the 1974 and 1975 figures included virtually no maintenance expenses.
 
 
 36
 Nevertheless, petitioners claim that the railroad has failed to rebut their claim that the deferral of maintenance was a deliberate attempt to downgrade. They cite Missouri-Kansas-Texas Abandonment, 338 I.C.C. 728 (1971), in which the ICC announced criteria that a railroad should address in showing that its deferral of maintenance or downgrading of service was economically justified rather than a deliberate attempt to downgrade:
 
 
 37
 (1) whether, on a systemwide basis, this carrier is either only marginally profitable or operating at a deficit; (2) whether the particular line under consideration is marginally profitable, operated at a deficit, or would have been operated at a deficit were it not for the deferral of maintenance and rehabilitation costs; and (3) whether the carrier can clearly show that its available funds for maintenance and rehabilitation are required for those portions of line within its system for which a greater public need has been demonstrated and which offers a larger profit potential for the carrier, and that the carrier has definite proposals as to how such expenditures are being made or will be made.
 
 
 38
 Id. at 746. Petitioners claim that the railroad has failed to show that any of these criteria apply.
 
 
 39
 We agree that the railroad has not shown (1) and (3) above, but we do not find that that mandates denial of the abandonment. First, the Commission stated that none of those criteria are controlling in a case and that "the weight to be accorded to each will vary with the facts presented." Id. Subsequent cases have shown that the Commission is far more concerned when there is evidence that the railroad has taken concrete steps to downgrade the line for the purpose of later abandoning it. For example, in Southern Pacific Transportation Co.--Abandonment, 354 I.C.C. 752, 755 (1978), the indications of intentional downgrading were reducing service to shippers to Saturdays only, refusing to accept full carloads, and discontinuing certain privileges continued on other lines of the carrier. The Commission stated that "downgrading is a concept that must be separately tested within the context of each case." Id. at 755.
 
 
 40
 Similarly, in Chicago & North Western Transportation Co. Abandonment, 354 I.C.C. 292, 303 (1977), abandonment was denied where the railroad downgraded service by failing to maintain the line, where it reduced train service on the line, where it failed without excuse to furnish rail cars, and where it abandoned the line without authorization.
 
 
 41
 We hold that reversal is not warranted for the ICC's failure to consider the two other criteria where there is no serious evidence of intentional downgrading. We have previously indicated that this is our view. For example, in International Minerals & Chemical Corp. v. ICC, 656 F.2d 251, 260 (7th Cir.1981), while noting the petitioners' claim that the Commission had ignored the three criteria, we said that "[t]he ICC properly stated that once it had made its determination that deferring maintenance was financially justified, the governing standard required it to accept [the railroad's] decision to defer maintenance for economic reasons unless the evidence showed 'some ulterior motive to downgrade deliberately.' "
 
 
 42
 Where there is no significant evidence of improper downgrading, the concern of the Commission is and should be on whether the deferral of maintenance was economically justified for that line, which is equivalent to the second factor of the Missouri-Kansas-Texas case.[4] The only claims here of intentional downgrading are, first, that shippers could not obtain railroad cars from B & O, and, second, that the filing of an abandonment application discourages shippers. As to the first, the reason for the failure to supply cars was not B & O's bad intent, but rather a nationwide shortage of grain cars. As to the second, the claim is purely conclusory and there is no way to prove that there is such an effect. In the absence of any more weighty evidence of downgrading, such as diminution of service without excuse, we hold that economic conditions justified the deferral of maintenance.
 
 V. OPPORTUNITY COSTS
 
 43
 Petitioners object to the Commission's calculation of B & O's opportunity cost incurred in the operation of the Flora line. The Commission stated that the abandonment was justified on the basis of the other evidence, but said that opportunity cost was an additional reason to grant the abandonment. The ICC calculated the opportunity cost by comparing the cost of keeping the assets tied up on the line as opposed to more profitable uses elsewhere. The other uses included a consideration of the return on investment of the net salvage value of the line. The calculation was not limited to the value of the use of the actual track on other B & O lines. The Commission concluded that B & O was incurring an opportunity cost of $138,681.
 
 
 44
 We agree with the Commission that abandonment is justified regardless of opportunity cost. Nevertheless, we find it appropriate to discuss the issue here.
 
 
 45
 Petitioners claim that the Commission should have limited its calculation of opportunity cost to the value of the use of the physical assets of the line on other B & O lines and assert that it was error to consider nonrail uses of the assets. Petitioners urge that this court rejected that calculation in our decision in Illinois v. United States, 666 F.2d 1066, 1081 & n. 24 (7th Cir.1981). There we held that B & O's opportunity cost argument must be rejected.
 
 
 46
 We disagree with petitioners that Illinois precluded the Commission from considering nonrail uses of the assets in calculating opportunity cost. What we said was that we could not accept B & O's opportunity cost argument on appeal because the Commission never reached the issue of opportunity cost; to accept it would have been to uphold the ICC's decision on a basis not articulated by the agency. Id. at 1081. In a footnote, we rejected B & O's salvage value calculation not as a matter of law, but rather because of the railroad's misplaced reliance on Missouri Pacific Railroad v. United States, 625 F.2d 178 (8th Cir.1980), a case we found distinguishable. We suggested, however, that B & O could make a more developed opportunity cost argument on remand: "We do not decide, however, whether an opportunity cost argument, perhaps based on more fully developed facts, might prevail in possible subsequent ICC proceedings or appeals." 666 F.2d at 1081 n. 24.
 
 
 47
 As to the propriety of considering nonrail uses in calculating opportunity costs, we have already upheld the Commission's adoption of a policy statement announcing that the agency would consider opportunity costs in the balancing of interests in abandonment cases and defining opportunity costs to include nonrail uses. Farmland Industries, Inc. v. United States, 642 F.2d 208 (7th Cir.1981), denying petition to review Abandonment of Rail Lines--Use of Opportunity Costs, 360 I.C.C. 571 (1979). See International Minerals & Chemical Corp. v. ICC, 656 F.2d 251, 259-60 (7th Cir.1981) (holding that the ICC erred in calculating opportunity costs but not criticizing the use of the line's salvage value). We find no reason to withdraw our approval of that policy. As we noted in the Farmland Industries decision,
 
 
 48
 [t]he Act does not define "public convenience and necessity" nor does it specify any criteria that the ICC must or should consider in deciding what is consistent with public convenience and necessity. Rather, the Act authorizes the ICC to use its discretion and expertise to determine, in each instance, whether abandonment should be permitted.
 
 
 49
 642 F.2d at 210-11.
 
 VI. FUTURE TRAFFIC
 
 50
 In Illinois v. United States we faulted the ICC's conclusion that the prospects for future traffic increases on the line were speculative because, we said, the Commission had not considered some evidence. 666 F.2d at 1079. Similarly, petitioners object to the Commission's holding in its most recent decision that traffic increases have not been substantial and that proposed future increases would produce insufficient revenues to cover the costs of operation. They claim that the Commission failed to explain why it concluded that the traffic had slight growth potential.
 
 
 51
 We hold that the Commission's discussion of the future traffic potential of the Flora line was sufficient and responsive to our concerns in Illinois. The first concern we had there was that the Commission had not considered the impact on the traffic figures of a 1977 strike by the largest shipper on the line. The Commission eliminated that problem in its 1982 decision, however, by disregarding the evidence for that year. Our second concern was the claim that the railroad had failed to provide enough freight cars to permit additional shipments of grain. The reason for this, however, was a nationwide grain car shortage and not an intent to keep traffic figures low. One of petitioners' own witnesses testified that he knew of no railroad that could meet all grain car orders.
 
 
 52
 The third concern we had was that the Commission did not consider petitioners' claim that the abandonment application caused some shippers to shift to other means of transportation. Petitioners assert in this petition that the filing of the abandonment petition "as a matter of common sense" deterred shippers from planning increases in shipping. This is purely speculative. Petitioners do not suggest how this effect could be measured or, if it exists, how it could be compensated for in determining traffic potential. We also hold that petitioners did not establish in the remanded proceeding that traffic was lost as a result of the pending application. We cannot accept their claim that they have established that there was a loss in the absence of any evidence; thus, we cannot find fault with the Commission's holding.
 
 
 53
 The fourth factor was the claim that the traffic on the line was growing. It is this claim that petitioners press most strongly in this petition. They allege that there was testimony that the traffic in 1980-1981 was the heaviest in years and that several shippers were increasing their loads.
 
 
 54
 Petitioners claim that the largest shipper on the line presented evidence that its carloadings for the first four months of 1981 had increased seventy percent over the entire carloadings for 1980. We find no evidence in the record to substantiate this claim. Similarly, the claim that 707 carloads for the first three-and-a-half months of 1981 represented "the best in recent years" is unfounded; if that rate continued throughout 1981, the number of carloads for the year would be no greater than the number of carloads in other recent years.
 
 
 55
 In addition, petitioners claim that it was arbitrary for the Commission to have considered only the proposed increases of traffic by two shippers. We find no error. Petitioners failed to show that any other shippers were proposing any substantial increases in service. The Commission need not have discussed the plans of every shipper on the line, but rather could focus its attention on the ones proposing the largest increases. As we have said before, "[t]he ICC [is] not required to discuss each factual point brought out by the petitioners." International Minerals, 656 F.2d at 260.
 
 VII. EFFECT OF THE CSX MERGER
 
 56
 In Illinois v. United States we directed the ICC to consider the merger of the Chessie System and the Family Lines Railroad System (CSX merger), which occurred on November 1, 1980. Specifically, we were concerned that the merger might result in significant additional revenues to the Flora line. 666 F.2d at 1081. In its January ruling, the Commission discussed the possible effect the CSX merger might have, concluding that petitioners' claim of possible development of future increased traffic was too indefinite to warrant denying the abandonment.
 
 
 57
 On January 27, 1982, petitioners, alleging new evidence and substantially changed circumstances, petitioned the Commission to reopen the case. Petitioners cited new, lower rates being offered to shippers using the Flora line and resulting increases in traffic over the line. On April 21, the Commission denied the petition to reopen, holding that the reduced rates were not significantly lower than previous rates, that the lower rates could not long be maintained over the line because of its high losses, and that petitioners had not shown what portion of the new traffic would inure to the benefit of the Flora line and what would merely be moving on the tracks to other locations.
 
 
 58
 The law is clear that "petitioners face the heavy burden of demonstrating that the ICC abused its discretion in refusing to reopen the record. The Supreme Court directs that federal courts decline to require reopening the record 'except in the most extraordinary circumstances.' " Union Mechling Corp. v. United States, 566 F.2d 722, 726 (D.C.Cir.1977) (quoting Bowman Transportation, Inc. v. Arkansas-Best Freight System, Inc., 419 U.S. 281, 296, 95 S.Ct. 438, 447, 42 L.Ed.2d 447 (1974)). We hold that the Commission properly exercised its broad discretion in denying the petition.
 
 
 59
 Petitioners claim that the abuse of discretion standard does not apply in this instance because in Illinois we directed the ICC to consider the effect of the CSX merger. We disagree because the Commission did sufficiently discuss the merger in its January decision based upon the evidence then available to it; the petition to reopen itself stated that the evidence was not previously available. Our decision in Illinois did not require the Commission to reopen the case whenever any new evidence of the effect of the CSX merger was discovered or alleged.
 
 
 60
 Decision making would be much less final if reopening a case were regularly required because of new evidence. There is always a delay between the end of a hearing and the time when an agency issues its decision, and there frequently is some new evidence discovered in the interim with arguable bearing on the case. See Bowman Transportation, Inc. v. Arkansas-Best Freight System, Inc., 419 U.S. 281, 294-95, 95 S.Ct. 438, 446-47, 42 L.Ed.2d 447 (1974). There simply are no extraordinary circumstances present here to compel reopening.
 
 
 61
 In any event, we find no error in the Commission's reasons for denying the reopening. Petitioners make much of the railroad's decision not to use the so-called fifty percent rule in computing affiliated rail lines' costs. The railroad instead employed Rail Form A costs, and petitioners claim that the Commission should not have allowed this change of procedures--the railroad had used the fifty percent formula in earlier phases of the proceeding--especially without discussing the change.
 
 
 62
 The Commission's acceptance of B & O's figures based on Rail Form A costs was not improper. The fifty percent rule has never been written into any regulations or statutes; rather, as we have stated in allowing the Commission to stop using that rule, "the so-called rule is only a formula to be used when a better one is not available." Chicago & North Western Transportation Co. v. United States, 582 F.2d 1043, 1060 (7th Cir.1978), cert. denied, 439 U.S. 1039, 99 S.Ct. 641, 58 L.Ed.2d 698. Nothing prevents the Commission from changing the method of calculating. Furthermore, no one was misled by the railroad's use of Rail Form A costs because in its submission to the ICC the railroad stated that it was using them. We find the other claims regarding the evidence of the CSX merger without merit.
 
 VIII. ALTERNATIVE TRANSPORTATION
 
 63
 Petitioners claim that the Commission's determination that adequate alternative means of transportation are available is arbitrary. They claim that there has not been any showing that motor carrier service is an adequate alternative.
 
 
 64
 This issue has been rendered moot by the terms of the sale agreement under which B & O will sell the Flora line to the Prairie Trunk Railway, which plans to continue to serve the shippers. In any event, we find no error in the Commission's conclusion because of the heavy use of motor carriers by many of the shippers and the availability of other motor carriers in the area.
 
 CONCLUSION
 
 65
 We have carefully considered all other claims petitioners raise and find them without merit. We hold that the ICC properly granted the railroad's application for a certificate of public convenience and necessity allowing it to abandon the Flora line.
 
 
 66
 THE PETITION FOR REVIEW IS DENIED.
 
 
 
 *
 Edward Dumbauld, Senior District Judge of the Western District of Pennsylvania, sitting by designation
 
 
 [1]
 Under the terms of the agreement as presented to this court, Prairie Trunk will expeditiously file and prosecute the necessary application for authority to acquire and operate the rail line. Meanwhile, B & O will continue to operate the Flora line until the earlier of (1) the date upon which Prairie Trunk exercises the authority granted to it by the ICC to acquire the line, or (2) the 60th day following a decision by this court allowing the abandonment to become effective. B & O also agrees not to abandon the track for a period of one year following that 60th day so as to allow Prairie Trunk the opportunity to obtain the necessary authority to acquire the rail line
 
 
 [2]
 Petitioners state that they did not receive B & O's evidence until 18 days prior to the deadline, but the railroad's evidence was filed 22 days before, which we deem the controlling date. Petitioners have not alleged that they could not have obtained copies if they had gone to the ICC in person on the day of the filing
 
 
 [3]
 We noted in Illinois that whether the substantial evidence or arbitrary and capricious standard of review applies is an unsettled question. We cited a Third Circuit case, Concord Township v. United States, 625 F.2d 1068, 1072-73 (3d Cir.1980), that applied the substantial evidence test but did not discuss its decision to do so. 666 F.2d at 1072. See International Minerals & Chemical Corp. v. ICC, 656 F.2d 251, 254 n. 3 (7th Cir.1981) (expressing doubts about the applicability of the substantial evidence test)
 
 
 [4]
 We note that despite its inclusion as one of the three criteria in the Missouri-Kansas-Texas case, system profitability repeatedly has been disclaimed as a controlling factor in abandonment. In Chesapeake & Ohio Railway Abandonment, 348 I.C.C. 343, 350 (1975), for example, the Commission approved the abandonment even though the carrier was financially strong. Thus even if B & O had been a strong carrier, the actual unprofitability of the line was the most important fact