709 F.2d 1186
 PEOPLE OF the STATE OF ILLINOIS, et al., Petitioners,
v.
INTERSTATE COMMERCE COMMISSION and United States of America,
Respondents,
Burlington Northern Railroad Company and Illinois Central
Gulf Railroad Company, Intervening Respondents.
 No. 82-2410.
 United States Court of Appeals,
Seventh Circuit.
 Argued April 22, 1983.
Decided June 14, 1983.
 
 James E. Weging, Asst. Atty. Gen., Chicago, Ill., Gordon P. MacDougall, Washington, D.C., for petitioners.
 Craig M. Keats, I.C.C., Washington, D.C., Richard M. Kamowski, Ill. Cent. Gulf R. Co., Chicago, Ill., for respondents.
 Before CUMMINGS, Chief Judge, POSNER, Circuit Judge, and FAIRCHILD, Senior Circuit Judge.
 POSNER, Circuit Judge.
 
 
 1
 This petition to review orders of the Interstate Commerce Commission allowing the abandonment of two railroad lines presents the following question: does the Staggers Rail Act of 1980 allow the Commission to authorize a protested abandonment without an investigation, even though the protestants allege facts material to determining whether the abandonment is consistent with the statutory criterion of public convenience and necessity, 49 U.S.C. Sec. 10903(a)?
 
 
 2
 On April 8, 1982, the Burlington Northern Railroad filed with the ICC a notice of intent to abandon a six and one-half mile long branch line in rural Illinois, and on May 1 it filed its formal application to abandon. The application showed minimal traffic on the line--58 carloads of freight in all of 1977, 65 in 1978, 49 in 1979, 133 in 1980, and only 47 in 1981, with the blip in 1980 being due to a fluke shipment of 85 carloads of corn cobs. Part of the line had been closed recently because an old wooden bridge was considered unsafe. The bridge would cost $136,900 to replace. But the Burlington's net earnings from operations on the line had been only $312 in 1981, while if it scrapped the line and invested the proceeds it would, it estimated, earn annual interest of $93,771. Thus, quite apart from the cost of replacing the bridge, it would cost the railroad more than $90,000 a year, in lost earnings from alternative uses of the assets at present committed to the line, to keep it open.
 
 
 3
 On June 1 a protest was filed by a representative of a railroad union, two shippers, and the Illinois Commerce Commission (which, we are told, automatically joins any shipper protest against abandonment of a railroad line in Illinois). The protest asked the Commission to order an investigation. Three grounds were advanced. The first was that the Burlington's own figures showed that the line was profitable. The second was that $136,900 was a minimal sum for bridge work, and anyway the protestants "consider the bridge acceptable for operating purposes without such an expenditure, and the veracity of the $136,900 sum is challenged," along with the timing: the bridge had been closed less than two weeks before the filing of the notice of intent to abandon. Third, the protestants disagreed that the substantial shipment of corn cobs in 1980 had been a fluke: "Our information is ... that if the line is returned to service the [corn cob] traffic is likely to return to rail."
 
 
 4
 The Commission refused to conduct an investigation, and on July 8 issued an opinion authorizing the abandonment of the line. The opinion revised the Burlington's 1981 net earnings from operations on the line upward to $7,188 and its opportunity costs (the earnings foregone by keeping the line in service) downward to $83,190, but these adjustments still left a big annual loss. The Commission rejected the protestants' contentions with regard to the bridge because "they did not present any supportive data for their allegations. In the absence of supporting rebuttal by protestants, we accept BN's evidence that the bridge needs to be replaced, and that the cost of replacing it would be $136,900." It rejected their contention about the corn cob traffic on the same ground: "Protestants ... do not document or give any supporting evidence for their position ...." The Commission also noted that the shipper of the corn cobs was not opposing abandonment of the line.
 
 
 5
 The other order before us involves the abandonment of a line 19 miles long owned by the Illinois Central Gulf Railroad. The application to abandon was filed a day before the Burlington's application. The profit and opportunity cost figures are almost identical to those of the Burlington's line; and corresponding to the $136,900 that the Burlington would have to spend to replace the wooden bridge is the $372,000 that the Illinois Central would have to spend to rehabilitate its line after years of deferred maintenance. The Illinois Commerce Commission filed a protest. No shippers joined, and labor filed its own protest. The protestants requested an investigation and again advanced three grounds. First, in exchange for the shippers' not opposing the abandonment the Illinois Central had agreed to retract a $625 per car surcharge that it claimed the Staggers Act entitled it to impose on the shippers because there was so little traffic on the line; the protestants questioned whether the railroad had really been entitled to impose such a stiff surcharge. Second, the posted speed limit on the line (20 m.p.h.) was already higher than the standard speed limit for first-class railroads (10 m.p.h.), so rehabilitation of the track was unnecessary. Third, the ICC had denied the Illinois Central's application to abandon a portion of this very line in 1979.
 
 
 6
 The Commission refused to order an investigation, and on July 9 issued an opinion authorizing abandonment. It commended "the private agreement alleged to have been made between the shippers" and the Illinois Central to eliminate shipper opposition: "Both the railroads and shippers profit from a voluntary negotiated settlement of their differences, and the public interest is thereby served." It agreed with the protestants "that the posted speed limit on the line exceeds the FRA Class I standard for the most part, but protestants do not challenge applicant's evidence showing that the line is in only fair to poor condition. Although maintenance could presumably be deferred for another year or more, eventually the railroad will be required to make substantial outlays for rehabilitation and maintenance." Finally the Commission noted that the railroad's previous attempt to abandon a portion of the line had "generated substantial shipper opposition and, in general, a much different record from this one."
 
 
 7
 We begin with two arguments pressed by the government with great, but misdirected, energy--that an order refusing to conduct an investigation is not appealable and that in any event it is not judicially reviewable. Whether or not it is appealable has no significance. The petitioners are appealing not the orders declining to conduct investigations but the orders--conceded to be appealable--allowing abandonment, orders they contend are fatally flawed because the Commission refused to investigate the factual allegations in the protests. If the refusal to investigate deprived the Commission of an adequate evidentiary basis for authorizing abandonment, as the petitioners contend, the orders authorizing abandonment cannot stand whether or not the petitioners could have taken the Commission to court when it decided not to investigate, without waiting for the Commission to issue final orders in the abandonment proceedings.
 
 
 8
 On whether orders to investigate are judicially reviewable we have no quarrel with the general proposition advanced by the government that judicial review of an administrative agency's decision not to allocate resources to a particular investigation is exceedingly limited. Rockford League of Women Voters v. United States Nuclear Regulatory Comm'n, 679 F.2d 1218, 1222 (7th Cir.1982). An agency normally violates no specific legislative mandate when it decides to put its investigative resources into one area rather than another. And even if the general mandate that every agency has, explicitly or implicitly, to advance the public interest provides a basis in principle for invalidating an agency's choice of where to put its money, the theoretical and practical objections to a court's second-guessing a managerial rather than legal judgment are formidable. But these cautionary notes are out of place here. "Investigation" is a misnomer in the abandonment context. The Commission does no investigating. All that the petitioners want is for the Commission to let them conduct their own investigations into the circumstances of the proposed abandonments and lay the results of those investigations before the Commission, and for the Commission then to weigh the evidence thus submitted against the railroads' evidence in deciding whether the proposed abandonments are consistent with the public convenience and necessity. Agency-inaction cases such as Rockford League of Women Voters are therefore inapplicable, the question here being whether the Commission improperly denied the petitioners the full evidentiary hearing they sought.
 
 
 9
 Between 1920, when Congress first gave the ICC authority over abandonments (see Transportation Act of 1920, Sec. 402, 41 Stat. 477-78), and 1972, the Commission's practice was to order an investigation in every case where abandonment was protested, although the statute said nothing about when an investigation was required. Interstate Commerce Act, 49 U.S.C. Secs. 1(18)-(20) (1952). In 1972 the Commission adopted a presumption, which was upheld in Commonwealth of Pennsylvania v. United States, 361 F.Supp. 208 (M.D.Pa.), aff'd per curiam, 414 U.S. 1017, 94 S.Ct. 440, 38 L.Ed.2d 310 (1973), that abandonment should be permitted without investigation if the line to be abandoned had carried fewer than 34 carloads in the previous year. But in 1976 Congress amended the Interstate Commerce Act to require the Commission to conduct an investigation in every abandonment case where it was petitioned to do so. Railroad Revitalization and Regulatory Reform Act of 1976 ("4-R Act"), Sec. 802, 90 Stat. 128, amending 49 U.S.C. Sec. 1a(3). Four years later, as part of the comprehensive "deregulatory" program of the Staggers Act, Congress eliminated this provision and instead provided that "the Commission shall ... determine whether an investigation is needed to assist in determining what disposition to make of the application [to abandon]." 49 U.S.C. Sec. 10904(c)(1).
 
 
 10
 Congress made this change in conjunction with placing tight time limits on abandonment proceedings. The Staggers Act creates three categories of abandonment: unprotested applications, which the Commission must grant within 45 days; protested applications that the Commission decides not to investigate, in which the Commission has 75 days from the filing of the application to decide whether to authorize abandonment; and protested applications that are investigated, in which an initial decision (i.e., one subject to appeal within the Commission) is due within 165 days. 49 U.S.C. Secs. 10904(b), (c)(2), (3). The Act allows 30 days from the date of the application for protests to be filed, and the Commission has 15 days after that to decide whether to investigate. If it decides not to investigate, it has another 30 days in which to act on the application (30 + 15 + 30 = 75). 49 U.S.C. Secs. 10904(c)(1), (2).
 
 
 11
 The Commission's regulations require that a railroad give 15 days' notice to shippers and others before filing its application to abandon, 49 C.F.R. Sec. 1152.20(b); that the application be verified and contain the railroad's entire case for abandonment, Sec. 1152.22; and that any protest state reasons for the protestant's opposition, present rebuttal of the applicant's case, and support any factual allegations by affidavit, Sec. 1152.25. But neither the statute nor the regulations contain criteria for when the Commission shall order an investigation. All that the regulations state on this score, parroting the statute, is that "protests will be considered by the Commission in all proceedings in determining whether an investigation is needed to assist in determining what disposition to make of the application." Sec. 1152.25(a)(3). See also Sec. 1152.26(b). When it adopted the regulations, the Commission stated, none too informatively, "The decision to investigate a protested abandonment application is now wholly within our discretion. In making the decision whether to investigate, we will consider all relevant factors on a case-by-case basis.... We see no reason for establishing an inflexible standard." Abandonment of Railroad Lines and Discontinuance of Service, 365 I.C.C. 249, 252 (1981). We understand that protests are being filed in about half of all abandonment proceedings and investigations ordered in about half of the protested abandonments.
 
 
 12
 The petitioners argue that the regulations go too far in requiring them to put in their whole rebuttal case in 30 days. The government replies that this is not the right kind of proceeding to test the validity of the regulations. But all this is beside the point. The Commission did not refuse to order an investigation because the petitioners had not complied with the regulations governing protests. If it had rejected the protests as noncomplying it would have had to grant the applications for abandonment within 45, not 75 days, and it would not have issued opinions. It treated these as protested applications. Nor did the Commission, in accepting the protests but refusing to order investigations, rely for that refusal on some criterion in the regulations; the regulations contain no criteria.
 
 
 13
 The petitioners' real argument, which we do not construe as an attack on the regulations, is that the Commission was unreasonable to act as summarily as it did in these cases, given the allegations made in the protests. In the language of the statute and regulations, an investigation was "needed to assist in determining what disposition to make of the application."
 
 
 14
 This argument has a strong and a weak form. The strong form is that the Commission must grant a hearing whenever the protest makes material factual allegations, as these protests did. This implies, however, that the Staggers Act did not change the 4-R Act's mandatory investigation requirement. Although the 4-R Act, Sec. 802, 90 Stat. 128, amending 49 U.S.C. Sec. 1a(3), provided that "the Commission shall, upon petition, ... cause an investigation to be conducted to assist it in determining what disposition to make" of the application to abandon, the Commission's regulations under the Act required that the petition contain the same information that the current regulations require that the protest contain, including "specific reason(s) for requesting the institution of an investigation, ... with allegations of fact supported by an affidavit of personal knowledge of the facts ... [and] any rebuttal of information or material submitted by the applicant ...." 49 C.F.R. Secs. 1121.36(a)(1)(iii), (iv) (Oct. 1, 1979). The language is almost identical to that of the current regulations. See 49 C.F.R. Secs. 1152.25(a)(1)(iii), (iv) (Nov. 1, 1982). The regulations under the 4-R Act further provided that "upon receipt of a petition to investigate the Commission shall determine the nature and extent of the investigation to be instituted." 49 C.F.R. Sec. 1121.37(a) (Oct. 1, 1979). And in response to criticisms of the length of abandonment proceedings under the 4-R Act, the Commission denied that it "will accept unsubstantiated petitions to investigate proposed abandonments, resulting in long, expensive, automatic investigations .... [W]e do require that certain specific information be submitted before we will entertain a petition for investigation." ICC Implementation of the 4-R Act: Synopsis of Views Presented at Hearings Before Subcomm. on Surface Transportation of S. Comm. on Commerce, Science, and Transportation, 96th Cong., 1st Sess., Feb. 7, 1979, at 156 (Comm. Print, May 1979).
 
 
 15
 So even under the 4-R Act the Commission apparently would not order a factual investigation unless the petition made material factual allegations of a specific and supported nature. There is an analogy to the requirement in Rule 56(e) of the Federal Rules of Civil Procedure for resisting a motion for summary judgment: "When a motion for summary judgment is made and supported as provided in this rule [i.e., by affidavits based on personal knowledge], an adverse party may not rest upon the mere allegations or denials of his pleading, but his response, by affidavits or as otherwise provided in this rule, must set forth specific facts showing that there is a genuine issue for trial."
 
 
 16
 Congress would have had no reason to replace the 4-R Act's mandatory investigation requirement with the discretionary one in the Staggers Act if it had intended the Commission to continue without change its practice under the 4-R Act of ordering an investigation when--but only when--a protestant showed that there was a genuine issue of material fact. And such an intention would have been inconsistent with the basic purpose of the Staggers Act--to lighten the burden of regulation for the railroads, and perhaps put them on the path toward complete deregulation. Nowhere had regulation pressed harder on them than in regard to abandonment. Long-drawn-out abandonment proceedings in which the investigations routinely ordered by the ICC played their part had prevented railroads except at great cost and with long delay from abandoning hopelessly unprofitable lines that were draining the railroads' life blood. (See Chicago & N.W. Transport. Co. v. United States, 582 F.2d 1043, 1045-46 (7th Cir.1978), and on the great potential savings to the railroads from abandonments Friedlander & Spady, Freight Transport Regulation 200 (1981).) Although the 4-R Act had put some time limits on the abandonment process, see Sec. 802, 90 Stat. 128, amending 49 U.S.C. Sec. 1a(3), a representative of the railroad industry had complained that "there has been very little, if any, cut in the processing time for the handling of opposed abandonment applications, which can take up to 2 years without court appeals.... The defect in the statute which causes the problem ... is that once the Commission issues an investigation order there are no requirements specifying completion of the investigation within a specific time limit." ICC Implementation of the 4-R Act, supra, at 165. The Commission admitted "that the abandonment process can be complex and lengthy," but said that "the statute [i.e., the 4-R Act] which requires that adequate notice be given and that affected parties be given the opportunity to participate in the process, has led to these 'problems.' " Id. at 156.
 
 
 17
 In response to these problems, which Congress took more seriously than the Commission, the Staggers Act eliminated mandatory investigation of contested abandonments and set strict time limits in all abandonment cases. The right to an investigation on petition that the Act had conferred on the opponents of abandonments was stripped from them, and the Commission was given discretion to decide whether or not to grant an investigation in the particular case. These petitioners would eliminate that discretion.
 
 
 18
 The only limitation the Staggers Act places on that discretion is indirect. A decision not to investigate presupposes that the merits of an abandonment can be determined within 45 days of the receipt of the railroad's application. If the application or the protests indicate that a reasonable judgment cannot be made within that period, the Commission must order an investigation; that is the statutory mechanism for giving the Commission additional time to receive evidence and make its decision. Although the Commission has no duty to investigate an abandonment merely because there are protestants alleging material facts, it has an inherent duty to investigate if otherwise it will not have enough information to decide whether the abandonment is in the public interest. The discretion granted by the Staggers Act is implicitly qualified by the requirements of due process.
 
 
 19
 This version of the petitioners' argument must be taken seriously and requires us to decide whether the Commission unreasonably denied them additional time to obtain and present evidence. That type of question has arisen in a variety of administrative contexts, and the general answer has been given that the costs of any additional procedural safeguard that is sought must be compared with the benefits in preventing errors. See, e.g., Mathews v. Eldridge, 24 U.S. 319, 335, 96 S.Ct. 893, 903, 47 L.Ed.2d 18 (1976); Frost v. Weinberger, 515 F.2d 57, 66 (2d Cir.1975); Sutton v. City of Milwaukee, 672 F.2d 644 (7th Cir.1982); cf. Friendly, "Some Kind of Hearing", 123 U.Pa.L.Rev. 1267, 1278-79, 1281 (1975). The strict time limits that the Staggers Act places on abandonment proceedings express a congressional determination that delaying abandonments creates costs, see S.Rep. No. 470, 96th Cong., 1st Sess. 39 (1979), U.S.Code Cong. & Admin.News 1980, p. 3978, including but not limited to the costs to the railroads of gathering and presenting, and to the Commission of sifting and weighing, additional evidence. With the costs must be compared the benefits in greater accuracy of decision-making from allowing protestants to put in evidence beyond what they can reasonably be expected to obtain within 30 days from the filing of the application to abandon.
 
 
 20
 This simple cost-benefit formula has now to be applied to our two cases. In the Burlington case the protestants wanted chiefly to show that shipments of corn cobs might resume and that the wooden bridge was in fine condition or in any event could be replaced for less than $136,900. Even if the protestants had been given all the time in the world, however, they could not have proved the proposition about the corn cobs to the Commission's or to our satisfaction; the corn-cob shipper was not opposed to the abandonment, so he could not have considered the line a valuable alternative to whatever means of nonrail transportation he had switched to. Regarding the bridge's condition, the protestants state that 30 days was too little time to retain a bridge expert and have him inspect the bridge. (They add this curious touch: the expert could not inspect the bridge without prearrangement with the railroad, lest he be run down by a train. But the bridge was out of service.) But even if a full, leisurely investigation would have shown that the old wooden bridge was in sterling condition--that the railroad really had shut it down just to strengthen its case for abandonment--this would not have changed the Commission's mind about abandonment. The line was carrying less than one carload of freight a week--was barely being used at all--and the railroad, if allowed to abandon the line and to invest the proceeds from selling the right of way and track and other assets, would be able to make more than ten times as much as it was making from using it for railroading. These are the Commission's figures, are not questioned by the protestants, and make a compelling argument for abandonment even if the bridge was still usable. See, e.g., Simmons v. United States, 698 F.2d 888, 894-95 (7th Cir.1983).
 
 
 21
 Of course, the question is not whether we would have ordered abandonment even if the protestants had been able to prove that the bridge was usable, but whether the Commission would have done so. SEC v. Chenery Corp., 318 U.S. 80, 87-88, 63 S.Ct. 454, 459, 87 L.Ed. 626 (1943). The Commission did not say that its decision would be the same if the bridge were usable; it said the bridge was unusable, and thus rejected the protestants' factual allegations without, it may be argued, allowing the protestants a fair opportunity to prove those allegations. But an alternative and more reasonable interpretation of the Commission's decision is that it thought the bridge's condition too peripheral an issue to justify the delay that an investigation would entail and therefore decided to resolve the issue as best it could on the evidence before it. This was a reasonable procedural decision; it did not violate due process or deny the protestants any statutory right.
 
 
 22
 With regard to the Illinois Central abandonment, two of the grounds urged by the protestants were argumentative rather than factual--that rehabilitation could be postponed because the speed limit on the line was still above standard (a conceded fact) and that the Commission had previously refused to permit a portion of the line to be abandoned (also conceded). These arguments were fully developed in the protests and could not have been strengthened by an investigation, because they were not premised on facts that were in dispute. The remaining ground, that the shippers had been coerced not to oppose the application to abandon, was peripheral. The financial figures, which again the protestants do not challenge, showed that the line was a losing proposition when opportunity cost was taken into account, as it properly was, e.g., Simmons v. United States, supra, 698 F.2d at 898. The absence of shipper opposition was a fact unlikely to be altered by even a lengthy investigation into the question of the proper surcharge. (The protestants seem not to deny that some surcharge would have been proper under 49 U.S.C. Sec. 10705a because of the line's low traffic density. See People of State of Illinois v. ICC, 660 F.2d 289 (7th Cir.1981) (per curiam).) The Commission was entitled to conclude that the delay that an investigation would create was not warranted by the slight probability that it would lead to a different result.
 
 
 23
 The Commission's failure to articulate standards for when it will order an investigation in an abandonment case, and its propensity, illustrated by the orders in these two cases, to resolve factual disputes that the protestants have not had a full opportunity to present evidence on rather than to admit that a different resolution would not change the outcome, are perhaps regrettable. But the issue is not whether the Commission is imperfect but whether it is unreasonable. Lacking general standards for when to grant a full hearing in an abandonment case, the Commission must perforce make a judgment in each case whether delaying abandonment will yield evidence that will, with enough probability to make the delay worthwhile, cause it to change its mind. If the application for abandonment makes a powerful prima facie case and the protests raise merely peripheral issues, the Commission is entitled to conclude, as it implicitly did in both of these cases, that a full factual investigation of those issues would not be worth the delay and other costs imposed on the railroad and ultimately the public.
 
 
 24
 The Commission's orders authorizing abandonment are therefore
 
 
 25
 AFFIRMED.