959 F.2d 915
 MARSHALL DURBIN FOOD CORPORATION, Alabama Public Service
Commission, Alabama State Docks and Terminal
Railway Alabama State Docks, Petitioners,
v.
INTERSTATE COMMERCE COMMISSION and United States of America,
Respondents,
Southrail Corporation, Intervenor-Respondent.
 No. 91-7612.
 United States Court of Appeals,
Eleventh Circuit.
 April 30, 1992.
 
 Lawrence E. Newlin, Roberts & Isaf, Atlanta, Ga., Paul D. Cullen, Collier, Shannon & Scott, K. Michael O'Connell, Daniel J. Harrold, Martin A. Wright, Karen M. Lockwood, Washington, D.C., for Marshall Durbin Food Corp.
 John W. Adams, Jr., Mobile, Ala., for Alabama State Dock and Terminal Ry., Alabama State Docks.
 Laurence R. Latourette, Weiner, McCattrey, Brodsky, Kaplan & Levin, Christopher Eric Hagerup, Jill M. Hawken, Washington, D.C., for Southrail Corp.
 Stanley W. Foy, Alabama Public Service Com'n, Montgomery, Ala., for Alabama Public Service Com'n.
 William Bruce McKinley, MS Public Service Com'n, Jackson, Miss., for MS Pub. Serv. Com'n/intervenor.
 Louis Mackall, ICC, Washington, D.C., for ICC.
 Robert B. Nicholson, Dept. of Justice, Appellate Section, David Seidman, Washington, D.C., Richard Compere, U.S. Atty. Gen.'s Office, Jackson, Miss., for USA.
 Petitions for Review of an Order of the Interstate Commerce Commission.
 Before KRAVITCH and BIRCH, Circuit Judges, and KAUFMAN*, Senior District Judge.
 BIRCH, Circuit Judge:
 
 
 1
 This case pits the economic judgment of a private rail carrier against the interests of certain beneficiaries of that carrier's rail service. In this appeal, we review a decision of the respondent, the Interstate Commerce Commission ("ICC" or "Commission"), respecting intervenor-respondent SouthRail Corporation's ("SouthRail") application to abandon the 75-mile rail line between Whistler Station, Alabama and Waynesboro, Mississippi. The petitioners and intervenor-petitioners, which include a food producer located in the affected region and the public service commissions of Alabama and Mississippi, urge us to reverse the final decision of the ICC granting SouthRail's abandonment application. For the reasons that follow, we find no reversible error in the Commission's prosecution of the proceedings before it, nor in the merits of the ICC's determination that the proposed abandonment should be permitted. Accordingly, we AFFIRM.
 
 I. FACTUAL AND PROCEDURAL BACKGROUND
 
 2
 Since 1988, SouthRail has operated about 700 miles of track in eastern Mississippi and southwestern Alabama which it acquired in dilapidated condition from a near-bankrupt predecessor. It fell upon SouthRail, after acquiring the track, to undertake significant maintenance and rehabilitation measures in order to preserve the rail system. But not all of the lines operated by SouthRail have been restored to economic health since its acquisition of the track. The subject of this litigation is a segment which, in SouthRail's view, is no longer economically viable.
 
 
 3
 On December 29, 1989, SouthRail filed an application before the ICC pursuant to 49 U.S.C. § 10903 (1988) and 49 C.F.R. § 1152.20 (1991) seeking to abandon the assertedly money-losing segment of its track linking Whistler Station and Waynesboro. Through an application to the ICC under section 10903 of the Interstate Commerce Act, a rail carrier deeming itself unduly burdened by the operation of a segment of track may seek agency authorization to abandon the segment. A railroad is relieved of its legal obligation to provide service on a rail line only by first obtaining from the ICC a certificate declaring that the "present or future public convenience and necessity require or permit the abandonment" of the line. 49 U.S.C. § 10903(a)(1) (1988). According to SouthRail, the costs of operating the Whistler Station-Waynesboro line outweighed any damage the public would suffer as a result of abandonment. SouthRail asserted that the segment had proved increasingly unprofitable during SouthRail's operation of the track and that the rehabilitation measures necessary to improve the track's prospects could not be justified by traffic volume.
 
 
 4
 Forty-two parties protested the application. See 49 C.F.R. § 1152.25 (1991). Generally, the protestants emphasized adverse economic effects that would accompany the withdrawal of rail service in the area, and argued that traffic prospects for the line were better than SouthRail had claimed. With the protestants' assent, SouthRail petitioned the ICC for a 60-day stay of the proceedings to discuss a potential resolution of the proposed abandonment with the affected parties. The Commission denied the stay petition on grounds that such a delay would "make it impossible for [the Commission] to meet the statutory deadlines" for the approval or denial of abandonment applications. R1-28-1 (ICC Decision of Feb. 8, 1990); see 49 U.S.C. §§ 10904(c)(2), (c)(3) (1988). The Commission did, however, grant an oral hearing on the application to be conducted by the ICC's Chief Administrative Law Judge ("ALJ").
 
 
 5
 The ALJ issued an initial decision denying the abandonment application. SouthRail Corp.--Abandonment, 7 I.C.C.2d 746 (1990) ("ALJ Decision"). The denial was based largely upon the ALJ's rejection of the financial data submitted by SouthRail evincing the track's poor prospects. Based on his own analysis, the ALJ found that the impact of the abandonment on communities, shippers, and rural development outweighed the adverse impact on the rail carrier that would result from continued operation of the track. Id. at 782-85. In addition, the ALJ raised the possibility, without making a "definitive" finding, that SouthRail had engaged in collusive behavior with other carriers in order to orchestrate the line's creeping obsolescence. Id. at 753. According to this conspiracy theory, SouthRail's collusion with other carriers would enable it to ultimately justify the abandonment of this and other lines which it never actually had any interest in operating.
 
 
 6
 On administrative appeal, the ICC reversed. SouthRail Corp.--Abandonment, 7 I.C.C.2d 854 (1991) ("Comm'n Decision"). Applying the statutory standard governing abandonment, the ICC examined whether the present or future public convenience and necessity permitted the proposed abandonment; this determination involved balancing the potential harm to affected shippers and communities against the existing and potential burdens on interstate commerce and the rail carrier that would attend continued operations. Id. at 873-74; see 49 U.S.C. § 10903(a); Colorado v. United States, 271 U.S. 153, 168, 46 S.Ct. 452, 456, 70 L.Ed. 878 (1926). A three-to-two majority of the Commission determined that these factors weighed on the side of SouthRail. Rejecting the protestants' challenges, the Commission accepted SouthRail's data demonstrating that continued operation of the line would result in substantial losses. Comm'n Decision, 7 I.C.C.2d at 873-74. The Commission also rejected the conspiracy theory as an allegation of "little substance" that had scant support in the record. Id. at 874. Subject to certain conditions, the ICC accordingly approved the abandonment.
 
 
 7
 The Commission's final determination, however, was rendered belatedly under the applicable statutory deadline. For cases, like this one, in which the Commission has decided that an investigation of the abandonment must be undertaken, 49 U.S.C. § 10904(c)(3) (1988) prescribes that the ICC must decide the matter within a deadline of 255 days following the filing date of the abandonment application. Here, the ICC decided at the eleventh hour to reopen the record in the matter in order to collect additional evidence from SouthRail, and in so doing, missed the statutory deadline. See R3-109 (Decision of Sept. 13, 1990). The Commission acknowledged the dilatory effect of its call for new evidence: "Because of these additional procedures, we did not issue a decision by ... the 255th day after the application was filed." Id. at 2. With the benefit of new historical data submitted by SouthRail, the Commission in June 1991 issued its final decision granting SouthRail authority to abandon the Whistler Station-Waynesboro line. This petition for review ensued.
 
 II. DISCUSSION
 A. The Statutory Deadline
 
 8
 Based on the ICC's failure to issue a final decision on SouthRail's abandonment application within the statutorily mandated time frame, the petitioners argue that the Commission lacked jurisdiction to reverse the ALJ's decision denying abandonment. They contend, therefore, that the ALJ's initial decision should be reinstated. Since it is clear from the record that the ICC missed its statutory deadline, the petitioners' position does not crave support in the facts. Rather, the real question raised by the petitioners' argument is one of law. To agree with the petitioners' view, we must hold that the ICC's failure to issue a final decision within the Congressionally-imposed time limitations of section 10904 divested the agency of jurisdiction to decide the matter.
 
 
 9
 Past decisions on this point ordain a contrary rule. Courts have consistently rejected arguments that deadlines in the Interstate Commerce Act or other federal statutes are jurisdictional. On the contrary, where the statute does not specify the consequence of an agency's failure to reach a final determination within the time allotted, courts are reluctant to conclude that the statute completely invalidates subsequent agency action. The Supreme Court squarely rejected the jurisdictional interpretation of statutory deadlines in Brock v. Pierce County, 476 U.S. 253, 106 S.Ct. 1834, 90 L.Ed.2d 248 (1986). In Brock, the Court held that the Secretary of Labor was not prevented from acting after the statutory deadline for a final determination on a complaint under the Comprehensive Employment and Training Act. Id. at 266, 106 S.Ct. at 1842; see 29 U.S.C. § 816(b) (1976). Absent a clear indication in the statute's text or history, the Court instructed, "courts should not assume that Congress intended the agency to lose its power to act" in providing a time limit on agency action. Brock, 476 U.S. at 260, 106 S.Ct. at 1839.
 
 
 10
 In an earlier opinion, the Third Circuit applied the same reasoning to the Interstate Commerce Act, holding that where the statute "contains no express sanction for noncompliance" with its the statutory deadline, belated agency proceedings need not be dismissed. Baltimore & O.C. Terminal R.R. v. United States, 583 F.2d 678, 690 (3d Cir.1978), cert. denied, 440 U.S. 968, 99 S.Ct. 1520, 59 L.Ed.2d 784 (1979); see also Fort Worth Nat'l Corp. v. Federal Sav. and Loan Ins. Corp., 469 F.2d 47, 58 (5th Cir.1972) ("A statutory time period is not mandatory unless it both expressly requires an agency or public official to act within a particular time period and specifies a consequence for failure to comply with the provision."); Linemaster Switch Corp. v. EPA, 938 F.2d 1299, 1304 (D.C.Cir.1991) (refusing to restrict the EPA's substantive authority as a remedy for failure to comply with a statutory deadline).
 
 
 11
 Statutory provisions pertaining to abandonment lack specific reference to any remedy for non-compliance with the deadlines of section 10904. Hence, the Commission has in the past taken the position that "the statutory deadlines in § 10904 are hortatory in nature; there are no sanctions for failing to meet them." Revision of Feeder R.R. Dev. Rules, 7 I.C.C.2d 902, 913 (1991).[1] The petitioners would nevertheless equate those deadlines with jurisdictional prerequisites. However, the silence of section 10904 as to sanctions for late decisions--coupled with our considered reluctance to engraft our own jurisdictional limitations on the substantive authority of a federal agency--dictates that we reject the petitioners' argument.
 
 
 12
 Further support for this result lies in the argument that the Commission tolled the time limit for deciding appeals by timely reopening the record prior to the expiration of the 255-day deadline. It has been suggested that "time limitations in appeals are not applicable to reopenings...." Simmons v. Interstate Commerce Comm'n, 784 F.2d 242, 245 (7th Cir.1985). The petitioners, however, point to the Commission's reopening of the proceedings as a separate error of law militating against a finding that jurisdiction remained with the Commission. Specifically, the petitioners assert that the ICC improperly departed from its neutral posture to attempt on its own to satisfy SouthRail's burden of proof. To this end, they surmise, the Commission reopened the record in order to generate sufficient evidence to justify an eventual approval of the abandonment.
 
 
 13
 Nevertheless, our review of the record discloses no support for the claim that the ICC was biased in favor of SouthRail at the time of reopening the proceedings.[2] We doubt, in any case, whether that question is relevant to the jurisdictional effect, if any, of the ICC's reopening the record in derogation of the statutory time limit. Given that the Commission has authority to reopen its proceedings on its own initiative, see 49 U.S.C. § 10327(g)(1) (1988), we find no basis for reversal in the petitioners' bald suggestion that the ICC reopened the record in order to improve the position of the carrier.
 
 B. The Merits of the Commission's Decision
 
 14
 Our review of the Commission's decision accords deference to the expertise of the agency in its determination of whether the abandonment is consistent with the public convenience or necessity. Accordingly, we will reverse the ICC's decision only if it is not supported by substantial evidence or "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. §§ 706(2)(E), (2)(A) (1988). See Georgia Pub. Serv. Comm'n v. United States, 704 F.2d 538, 542 (11th Cir.1983); Parker v. Bowen, 788 F.2d 1512, 1519-20 (11th Cir.1986) (en banc). Although we examine the ALJ's decision as part of the record, our review is directed at the final conclusion of the Commission itself. Georgia Pub. Serv. Comm'n, 704 F.2d at 542. We will not substitute our judgment or conclusions for those of the Commission if the record, taken as a whole, provides substantial evidence supporting the Commission's findings. Alabama Pub. Serv. Comm'n v. ICC, 765 F.2d 1516, 1521 (11th Cir.1985).
 
 
 15
 While these principles are well-settled, we note the disagreement of the parties with respect to the effect of the ALJ's contrary initial decision. The petitioners assert that the ICC's final decision reversing the ALJ fails to evince an appropriate deference to the ALJ's credibility findings, which presumably were pivotal in his ultimate determinations on issues involving conflicting testimony, such as the impact of the abandonment upon communities and the future traffic prospects for the line. They contend that the ICC committed a reversible error of law in failing to accord greater consideration to the ALJ's initial determinations.
 
 
 16
 However, the law of this circuit dictates a different analysis. While "[p]art of the record we review is the initial decision of the ALJ," that does not mean that "when the record is susceptible of two interpretations we will readily overturn the Commission in those situations where it differs from the ALJ." Georgia Pub. Serv. Comm'n, 704 F.2d at 543. Hence, we do not ascribe a distinct error of law to the Commission every time it fails to exhaustively rebut the rationales or findings of the ALJ, as petitioners urge us to do. Rather, we consider any difference of opinion between the initial and reviewing tribunals as an integral component of our inquiry into whether there is substantial evidence to support the decision. See Parker, 788 F.2d at 1521.[3]
 
 
 17
 Our review is informed by the same regulatory standards that guided the ICC. Among the factors the Commission considers are the avoidable loss on the line, opportunity costs suffered through operation of the line, any necessary rehabilitation expenses, the prospects for future profitability, and whether the affected shippers have practical transportation alternatives. The Commission must also take into account whether the abandonment "will have a serious, adverse impact on rural and community development." 49 U.S.C. § 10903(a) (1988). This balancing process is framed by a general congressional intent to "assist shippers who are sincerely interested in improving rail service, while at the same time protecting carriers from protracted legal proceedings which are calculated merely to tediously extend the abandonment process." H.R.Conf.Rep. No. 1430, 96th Cong., 2d Sess. 125 (1980), reprinted in 1980 U.S.C.C.A.N. 3978, 4110, 4157 (Conference Report pertaining to the Staggers Rail Act of 1980).
 
 
 18
 Based on substantial evidence, it is clear that SouthRail's tedium should end. In its expertise, the Commission interpreted the data before it--including supplemental historic traffic data that had not been before the ALJ--to support a conclusion that "[w]hen economic costs are factored in, the line may be operating at a loss in excess of a $1 million annually." Comm'n Decision, 7 I.C.C.2d at 873. The record contains evidence that from July 1988 to June 1989, the segment yielded a modest operating profit that was far exceeded by attendant opportunity costs and rehabilitation outlays.[4] In the subsequent year, SouthRail's data showed operational losses of nearly $300,000, accompanied by opportunity and rehabilitation costs of $870,000. Proceeding with appropriate deference to the Commission's judgment, we cannot reject the ICC's forecast based merely on the protestants' surmise that aggressive marketing and renegotiation of switching charges might allay the carrier's future losses.
 
 
 19
 The Commission further concluded that the record showed no prospects for increased traffic or revenues. While the petitioners have cited testimony by numerous parties who purport to anticipate increased contributions to traffic, that testimony is somewhat undermined by the fact that none of the intervenors is a shipper located on the line. See id. at 854 n. 1. Noting this fact, the Commission concluded that the real impetus for the present contest is not an interest in the Whistler Station-Waynesboro track, but rather concern over the future of an adjacent line of track. Id. at 873. In the final decision, the majority hints that the opposition among shippers springs largely from a concern that the present abandonment will precipitate the abandonment of other segments, pursuant to a secret SouthRail plan to collusively streamline all rail shipping in the area. Id. at 873-74. Notwithstanding the petitioners' speculations, the abandonment application before the Commission concerned a specific, 75-mile segment of track. Given the positions and apparent interests of the intervening parties, there was substantial reason for the Commission to reject testimony that sufficient traffic could be generated to justify operation of the Whistler Station-Waynesboro line.[5]
 
 
 20
 Alternative modes of transportation available to shippers were thoroughly discussed in the Commission's final decision. Id. at 861-63, 865-68, 874. Initially, we note that the remaining on-line shippers have successfully arranged for alternative transportation. See id. at 854, 862-63. It would therefore be a curious holding indeed for us to decide that the Commission erred in finding adequate alternatives for on-line shippers. Off-line shippers, moreover, have not demonstrated any loss of rail service, nor have they shown a circuity resulting from the abandonment that will have more than minimal economic effect. See id. at 867. As the ALJ acknowledged in his initial decision, the record also demonstrates the availability of non-rail alternatives. See ALJ Decision, 7 I.C.C.2d at 777.
 
 
 21
 In light of the availability of alternatives, we also hold that the Commission had a rational basis to reject the testimony, including that of public officials, proffered by the protestants to establish an adverse impact on community development in the region. The record fails to demonstrate any community impact that would outweigh the significant financial burdens--those visited upon SouthRail as well as those dispersed throughout interstate commerce--associated with operating the line. Hence, the Commission's assessment of the impact on the region is adequately supported.
 
 
 22
 The Commission also specifically addressed the possibility that SouthRail had predestined the abandonment of the line and, to that end, had participated in a conspiracy aimed at downgrading the track and reducing traffic volume. Although the ALJ intimated a conspiracy theory in his initial decision, the Commission correctly noted that the record before the ALJ was inadequate to support a finding of collusive behavior. Comm'n Decision, 7 I.C.C.2d at 874. In the absence of additional evidence to support the theory, it was not error for the Commission to reject this ground for a denial.
 
 
 23
 We have thoroughly examined the record in this matter. Although the Commission split three-to-two in approving the abandonment, that disagreement does not relax the limitations which govern our review of this case. The record on appeal is replete with evidence lending substantial support to the Commission's majority decision. Our standard of review, furthermore, does not accord us the authority to revisit de novo the public convenience and necessity test. "Once the ICC has drawn its conclusion, an appellate court must give deference to the expertise of the agency." Alabama Pub. Serv. Comm'n, 765 F.2d at 1523. Because the Commission's final decision rationally rests on ample foundation in this record, we find that the decision was based on substantial evidence and was neither an abuse of discretion nor arbitrary and capricious.[6]III. CONCLUSION
 
 
 24
 Our review of the law in conjunction with the record discloses that the ICC retained jurisdiction to issue its decision in this matter, and that it did so in compliance with the mandates of the Administrative Procedure Act. Accordingly, we AFFIRM the Commission's approval of the SouthRail abandonment application.
 
 
 
 *
 Honorable Frank A. Kaufman, Senior U.S. District Judge for the District of Maryland, sitting by designation
 
 
 [1]
 Petitioners assert that the ICC took the contrary position in its ruling denying a 60-day stay of the proceedings, which SouthRail originally sought in order to discuss a potential resolution of the abandonment with the affected parties. While the Commission explained its denial of the stay in terms of the impending statutory deadlines, nothing in the Commission's written decision on that matter bars its present position that those deadlines are not jurisdictional in nature. The Commission did not concede that it would lose jurisdiction over the application merely by stating its intention to meet the statutory deadline. See R1-28 (ICC Decision of Feb. 8, 1990)
 
 
 [2]
 Indeed, it is mysterious that the petitioners would conclude that the Commission hoped to justify the abandonment when it reopened the record. The text of the reopening Decision of September 13, 1990 reveals that Chairman Philbin and Commissioner Phillips, who ultimately cast votes to approve the abandonment, dissented from the reopening of the record. See R3-109-3-5. No less telling, Commissioner Simmons, who ultimately voted to deny the abandonment, cast a crucial third vote in favor of reopening the record. Id. at 3
 
 
 [3]
 Petitioners also challenge the Commission's final decision as inadequate to support meaningful review, contending that the decision rejects the ALJ's findings without any express rationale. While this court has noted that an agency should clearly express and elaborate its rejection of the original credibility findings made by an ALJ, Parker, 788 F.2d at 1521-22 & n. 11, we have acknowledged that "the reviewing court's function would not be frustrated if the [agency's] implicit rejection and explanation were sufficiently clear to permit review." Id. at 1521-22 n. 11. Here, the ICC's final decision includes substantial discussion on issues of credibility. See, e.g., Comm'n Decision, 7 I.C.C.2d at 858, 868-69. Our review also benefits from the Commission's summary of the ALJ findings, see id. at 855-57, juxtaposed against a lengthy discussion of the Commission's own rationale. As the Parker standards are satisfied by the opinion, we are able to meaningfully review the Commission's decision on the merits
 
 
 [4]
 Opportunity costs are measured by the loss incurred by the carrier when it forgoes a more profitable use of its assets. See, e.g., Simmons v. United States, 698 F.2d 888, 897 (7th Cir.1983). Rehabilitation costs are those involved in restoring the track to suitable operating condition
 
 
 [5]
 In an effort to allay concerns about SouthRail's intentions concerning the adjacent "Meridian" segment, the Commission conditioned the abandonment approval on five years' continued operation of that line by SouthRail. Comm'n Decision, 7 I.C.C.2d at 868
 
 
 [6]
 Petitioners also allege that SouthRail's abandonment application was defective in two respects. First, they fault SouthRail for failing to provide system data for the other carriers owned by its corporate parent, MidSouth Corporation. If a line proposed for abandonment is part of a railroad system under common control and management, the applicant must file systemwide data. 49 C.F.R. § 1152.22(d)(6). Here, however, the record shows only a parent-subsidiary relationship. Hence, the Commission did not commit reversible error in deciding that no coordination of the MidSouth rail lines was established sufficient to constitute common control or management over the lines. See Comm'n Decision, 7 I.C.C.2d at 872
 Second, the petitioners claim that, technically, SouthRail should have included in its application some mention of its trackage rights in a 4.7 mile line immediately south of the line in question here. Nevertheless, the petitioners have failed to show why this defect is material. Common sense alone prevents us from holding that such an omission should be fatal to the abandonment application as a whole.