**CSX TRANSPORTATION, INC., et al., Petitioners,**

v.

**INTERSTATE COMMERCE COMMISSION and United States of America, Respondents,**

**Huron Valley Steel Corporation, Intervenor.**

### No. 90–1563.

United States Court of Appeals, District of Columbia Circuit.

Argued Sept. 16, 1991.

Decided Jan. 3, 1992.

Fred R. Birkholz, with whom, Richard E. Kienle was on the brief, for petitioners.

Judith A. Albert, Atty., I.C.C., with whom, James F. Rill, Asst. Atty. Gen., John J. Powers, III and John P. Fonte, Attys. Dept. of Justice, and Robert S. Burk, Gen. Counsel and Craig M. Keats, Deputy Associate Gen. Counsel, I.C.C., were on the brief, for respondents.

John Guandolo was on the brief, for intervenor.

Before WALD and EDWARDS, Circuit Judges, and FAIRCHILD,* Senior Circuit Judge, United States Court of Appeals for the Seventh Circuit.

Opinion for the Court filed by Senior Circuit Judge FAIRCHILD.

FAIRCHILD, Senior Circuit Judge:

Huron Valley Steel Corporation ("Huron Valley") filed a complaint with the Interstate Commerce Commission ("ICC" or "Commission") alleging that the rates charged on shipments of nonferrous scrap metal ("NFSM") from Anniston, Alabama to Belleville, Michigan, were in violation of 49 U.S.C. § 10731(e) (section 204(e) of the Staggers Act). Administrative Law Judge Frederick M. Dolan, Jr., found the carriers to be in violation of the maximum rate cap for recyclable commodities and ordered the carriers to pay reparations of $339,815 plus interest for shipments from November 7, 1982, through 1985. The carriers appealed to the ICC. The Commission affirmed the decision of the Administrative Law Judge. The carriers petitioned for review.

## I. Background

In 1980, Congress enacted the Staggers Rail Act, Pub.L. No. 96–448, 94 Stat. 1895 (1980). Section 204(e) of the Act, codified at 49 U.S.C. § 10731(e), required rail carriers to reduce and maintain rates for transportation of recyclable materials at or below an average revenue-to-variable cost ratio to be set by the ICC. The Commission subsequently set the ratio at 146% and has increased it only slightly from time to time. In order to calculate appropriate rate reductions and refunds, the carriers submitted 1977 cost and revenue data to the Commission. From the data, the Commission prepared "Schedule C" consisting of revenue-to-variable cost ratios broken down by recyclable commodities and the direction of the movement between three regions of the United States, East, West and South. The Commission ordered immediate rate

reductions and refunds where these ratios were above the 146% cap.

"Schedule C" included a revenue-to-variable cost ratio for NFSM movements from South to East. Ex Parte No. 386, *Increased Freight Rates and Charges–Nationwide–1981*, Schedule C at 168 (Dec. 12, 1980) (not printed). The NFSM shipments involved in our case were from South to East. Although the revenue-to-variable cost ratios for particular commodities moving within a region or between regions generally exceeded the 146% cap, and rate reductions and refunds were required, this was not true of NFSM movements from South to East. Apparently, the only relevant movement in 1977 was at a low rate that produced a ratio between 92.7% and 125.5%, depending upon the method of calculation.

On July 11, 1983, the Commission issued a decision concluding that all of the rates "in the aggregate" were at or below the 146% ratio for each commodity. Ex Parte No. 394, *Cost Ratio for Recyclables–1980 Determination*, 367 I.C.C. 623, 636 (1983). We assume that "aggregate" reflects the fact that, as to a particular commodity moved within a region or between regions, some rates would produce ratios above the cap but be offset by rates producing ratios below the cap.

In 1982, Huron Valley began shipping NFSM from Anniston, Alabama to Belleville, Michigan. The Huron Valley traffic was not included in the "Schedule C" data used to calculate rate reductions and refunds because Huron Valley had not yet entered the market in 1977. *Interstate Commerce Comm'n v. Seaboard Sys. R.R. Inc.*, Doc. No. 39886 at 2, 1990 WL 287860, 1990 ICC Lexis 307 (Sept. 17, 1990). The carriers charged Huron Valley rates that produced revenue-to-variable cost ratios well in excess of the statutory cap. Although we have not been told the money amount of rates per unit of weight, quantity and distance, we have assumed that the

* Sitting by designation pursuant to 28 U.S.C. § 294(d) (1988).

rates charged Huron Valley in 1982 and later years were substantially in excess of the rate charged for the one relevant 1977 shipment.[1] Huron Valley never received a rate reduction or refund from the carriers. As far as we know, no other shipper of NFSM from South to East received a refund. On November 6, 1984, Huron Valley filed its complaint before the ICC alleging that it was charged rates above the statutory cap in violation of § 204(e). This proceeding involved, up to the time of decision, eleven car movements in 1982, ninety-three in 1983, ninety-seven in 1984, and fifty-four in 1985. *Seaboard,* at Appendix B. There had been nineteen additional shipments between July 2 and November 7, 1982, but Huron Valley conceded that claims on those shipments were barred by the statute of limitations, 49 U.S.C. § 11706(c)(1) (1982).

The Commission held that a complaint like Huron Valley's, based on excessive revenue-to-variable cost ratios calculated for individual shipments, was available upon either of two grounds. First, the Commission decided that *Norfolk & Western Ry. Co. v. United States,* 768 F.2d 373 (D.C.Cir.1985), *cert. denied,* 479 U.S. 882, 107 S.Ct. 270, 93 L.Ed.2d 247 (1986), was distinguishable from this case because no initial rate reduction had been made on Huron Valley's shipments and, therefore, there was no danger of a double refund to Huron Valley. Huron Valley's shipments began after the 1977 compliance data were prepared, and the minimal 1977 data were unrepresentative of Huron Valley's traffic. *Seaboard,* at 5–6. The Commission relied in part on a concededly less than perfect analogy with its awards of reparations for individual movements of automobile shredder residue ("ASR"). ASR had not been treated as a separate commodity in Schedule C, but included in a group labeled "All Other Traffic." The Commission had concluded that a reliable finding of territorial compliance for ASR had thus been prevented. *Seaboard,* at 6. *See Atchison, Topeka & Santa Fe Ry. Co. v. ICC,* 851 F.2d 1432, 1433 (D.C.Cir.1988).

Second, the Commission held that Huron Valley's complaint could be treated as a request for reopening of the original compliance proceeding under 49 U.S.C. § 10327(g). Because the original compliance data for NFSM movements from South to East were based upon minimal transportation activity and, "[b]y the time the compliance process was being complet-

---

1. The Commission's decision stated:

   As Schedule C demonstrates, the total variable costs for *all* NFSM movements in the South-to-East district for 1977 were very small, either $720 or $812 depending on the cost of capital used in the computation. The variable cost for *each* of the [1982–1985] movements is over $1,000; this suggests that only one small shipment of NFSM moved South-to-East in 1977 (and that it was subject to a relatively low rate). Moreover, there is a great disparity in the revenue/variable cost ratios produced by the Schedule C data and the data for the [1982–1985] movements. Both the single shipment and the differences in ratios support the proposition that Schedule C bears no relation to Huron's shipments.[19]

   ....

   [19] That Schedule C is unrepresentative in this case is supported also by the fact that other ratios calculated by the Commission for NFSM are not close to the South-to-East Schedule C ratio. For example, the East-to-South Schedule C ratio was 183.3 percent, and the Commission's Section of Rail Costing has calculated a Schedule C national average ratio for NFSM of 174.2 percent.

   *Interstate Commerce Comm'n v. Seaboard Sys. R.R. Inc.,* Doc. No. 39886 at 5, 1990 WL 287860, 1990 ICC Lexis 307 (Sept. 17, 1990) (footnotes 17 and 18 omitted) (emphasis in original). We assume that in 1977 there was more than one scheduled rate applicable to NFSM movements from South to East, depending on routing and perhaps other factors, and that if Huron Valley had made its shipments in 1977, the higher rate applied to its 1982–85 shipments would have been charged (except for increases in the interim). The ultimate question then, is whether all 1977 rates for NFSM movements from South to East were sufficiently tested and validated for compliance with § 204(e) by the fact that the low rate applied to the one actual 1977 shipment produced a revenue-to-variable cost ratio less than 146%.

   Counsel for the Commission does assert that "[t]he Commission inferred that their low rate in effect for 1977 was either an aberration, or was increased substantially (probably in 1982)." Respondent's Brief at 6–7. We do not find that explanation in the decision. The railroads have relied wholly on the Commission's 1983 finding that rates, in the aggregate, were in compliance.

ed, substantially higher rates than those used in the compliance proceeding were being applied to significant new movements," the Commission found that a reopening of the proceedings was appropriate. *Seaboard,* at 7.

## II. INDIVIDUAL SHIPMENTS

■ The carriers argue that this court's decision in *Norfolk & Western* prohibits Huron Valley's complaint based on individual shipments and that, therefore, the Commission's decision was contrary to law. In *Norfolk & Western,* this court held that when rates for a recyclable had once been found in compliance with § 204(e) on a territorial average basis (some rates pertaining to the same commodity and territory being above the cap and some at or below the cap) the Commission could not order further reductions and refunds of those rates remaining above the cap but offset by lower rates in the averaging process. *Norfolk & Western,* 768 F.2d at 381; *Atchison,* 851 F.2d at 1433.

In *Atchison* this court reviewed an order granting refunds to a shipper of ASR, based on computation of revenue-to-variable cost ratios computed for individual shipments. The opinion explained that *"Norfolk & Western did not address the case of rates above the statutory ceiling that had not been adjusted under the territorial average method"* and that ASR had not been "subjected to territorial averaging by the 1981 reductions, apparently for want of a revenue and cost data base sufficient to permit such averaging." *Atchison,* 851 F.2d at 1433–34. It does not appear that the Commission's rationale was challenged in that review nor its propriety decided by this court. The *Atchison* holdings dealt only with statute of limitations issues, the order was vacated, and the case "remanded for a definitive determination of the proper prescription period." *Id.* at 1439.

In the NFSM case before us, NFSM had been treated as a separate commodity in Schedule C, and there were some data,

though scant, from which a revenue-to-variable cost ratio was computed, supporting the general finding that rates in the aggregate were in compliance. *Norfolk & Western* clearly applies here.

The Commission's decision to entertain an individual complaint from Huron Valley clearly contravenes *Norfolk & Western.* *Norfolk & Western* forbade the Commission from "authoriz[ing] reductions or refunds with respect to rates already in compliance with section 204(e) on a territorial average basis." *Norfolk & Western,* 768 F.2d at 381. The Commission contends that the unrepresentativeness of the Schedule C data permit it to entertain an individualized petition here. But *Norfolk & Western* is unequivocal and we will not permit the Commission to avoid it based on an undefined notion of unrepresentative data.

Furthermore, the ICC is incorrect in maintaining that *Norfolk & Western* does not govern because the Commission's compliance process based on territorial averaging produced no refunds or reductions regarding South-to-East NFSM rates. Although the *Norfolk & Western* court's concern for "double jeopardy" is most poignant where refunds have been ordered, the decision is based on economics of the railroad industry that apply equally strongly here. Because railroads face varying degrees of competition over different routes, territorial averaging, once begun, must be followed in order to guarantee railroads an adequate return on their capital. The revenue-to-variable cost ratio established by § 204(e) and the ICC works to protect *both* shippers and railroads.

> Petitioners [railroads] raise serious charges that the *1983 Decision* will lead to violations of the revenue adequacy requirement of § 204(e). Petitioners note that they have already reduced their rates to the 146% level as computed on a territorial average basis. If further individual rate reductions were now ordered, the industry average could fall below the 146% level thereby denying rail carriers adequate revenue in violation of the ex-

plicit command of section 204(e). It is no answer to this charge for the Commission to assert that rail carriers will be able to balance individualized rate reductions with individualized increases, since market pressures may prevent the necessary increases from being realized. In that situation, rail carriers would wrongly be forced to subsidize recyclables overall by reducing rates for recyclables on the most profitable routes.

*Norfolk & Western,* 768 F.2d at 380 n. 8. To the extent that individualized challenges to rates found in aggregate compliance are allowed, revenue adequacy is threatened— regardless of whether a refund was initially ordered.

### III. REOPENING COMPLIANCE PROCEEDING

■ As a second ground, the Commission decided that it was appropriate to reopen and reconsider its 1983 finding of compliance as to NFSM South-to-East movements. The Commission may reopen a proceeding at any time due to "material error, new evidence, or substantially changed circumstances." 49 U.S.C. § 10327(g)(1)(A) (1984). The decision to reopen a proceeding is within the discretion of the Commission and will be overturned only upon a showing of a clear abuse of discretion. *Interstate Commerce Comm'n v. Bhd. of Locomotive Eng'rs,* 482 U.S. 270, 278, 107 S.Ct. 2360, 2365, 96 L.Ed.2d 222 (1987).

The original compliance proceeding led to a decision, dated July 11, 1983, that the "present rates ... in the aggregate are at or below the 146–percent level." Ex Parte No. 394, 367 I.C.C. at 628. As to movements of NFSM from South to East, the compliance finding was based solely on the 1977 shipment at a lower rate, which produced a revenue-to-variable cost ratio far below 146%. Because there were no 1977 shipments at the higher (and more profitable) rates charged Huron Valley in 1982 and thereafter, the 1977 experience could not validate the higher rates. The compliance finding could only be correct if it were

assumed that territorial averaging of the higher and lower rates when applied to actual shipments would produce a revenue-to-variable cost ratio at or less than 146%. Huron Valley brought forward new evidence to show that that assumption was incorrect. The Commission found that the 1977 compliance data were based upon a single shipment of NFSM from South to East at a relatively low rate. The Commission found that there had been a significant increase in movements of NFSM from South to East since 1977 and that the carriers were charging substantially higher rates on these new movements. "Had those movements taken place during the Schedule C data compilation period, or had that information been brought to our attention in connection with the compliance proceeding, we undoubtedly would have ordered some form of rate reduction." *Seaboard,* at 7. The Commission, therefore, had sufficient evidence to conclude that, in its discretion, a reopening of the compliance proceeding was warranted based upon either "new evidence" or "material error." We conclude that the Commission did not abuse its discretion in reopening the compliance proceeding.

■ The carriers argue that Huron Valley had the opportunity to bring this evidence to the Commission's attention during the original compliance proceeding, and by not doing so, Huron Valley waived its objection to the accuracy of the "Schedule C" data. The Commission appropriately considered the timeliness of the complaint in its decision to reopen. The Commission found that Huron Valley had filed its complaint in a timely manner after the close of the compliance proceedings. The Commission noted that, in its decisions, it had repeatedly made reference to the opportunity for individual complaints at a later date. The Commission found that Huron Valley justifiably relied upon these statements and should not be penalized for doing so. *Seaboard,* at 7–8. We find no abuse of discretion in the Commission's conclusion that the request was timely.

Our conclusion that the Commission properly reopened its 1983 decision as to NFSM movements from South to East does not, however, bring us to denial of the petition for review. Reopening means just that, and the initial process of possible rate reductions and refunds must be based on territorial averaging.

*Norfolk & Western* made it very clear that § 204(e) required "the immediate reduction of recyclable rates until territorial average rates are equal to or less than the statutory ratio." *Norfolk & Western*, 768 F.2d at 379. Because of the nature of the averaging process, it is possible that individual rates may remain above the statutory level until brought into compliance as a result of inflation. *Id.*

We must vacate the awards under review and remand for further proceedings which will carry out territorial averaging. The first step is to select a period yielding sufficiently representative data, probably the entire period since Huron Valley began making shipments of NFSM from South to East. Data from *all* South-to-East NFSM shipments for the period must be included in the averaging process. If, as ICC counsel represents, Huron Valley is the only such shipper, then the result presumably will not change. By considering *all* similar shipments, this process does not violate *Norfolk & Western*. Any new rates will be based on average territorial data, and the railroads' revenue requirements, therefore, will be met.[2]

Petitioner rail carriers have asserted that they failed to analyze or challenge Huron Valley's costing evidence before the Commission because they relied on their interpretation of *Norfolk & Western* and the ICC's 1983 finding that the rates were in compliance. They seek the opportunity to challenge the data if we reject their assumptions. The carriers have surely waived the right to challenge the cost data used by the Commission except for their claim that territorial averaging is the proper method. On remand they will be entitled to challenge Huron Valley's costing evidence only in the event and to the extent that the Commission finds it appropriate to reexamine that evidence.

### IV. CONCLUSION

The petition for review is *granted.* The order is *vacated,* and the matter is *remanded* to the Commission for further proceedings consistent with this opinion. Each party shall bear its own costs in this court.

---

**2.** We note that the Commission has adopted regulations, effective November 16, 1989, at 49 C.F.R. ¶ 1145, to ensure continued compliance by rail carriers with § 204(e). The Commission explained that the new regulations

provide for a proceeding to be conducted each year to determine: (1) the revenue/variable cost ratio level corresponding to the statutory cap provision; and (2) the revenue/variable cost ratios produced by current rates on re-

cyclable commodities. The rules also set forth principles and procedures governing review of maximum reasonableness of increases in recyclable commodity rates.

Ex Parte No. 394, *Cost Ratios for Recyclables— Compliance Procedures,* 6 I.C.C.2d 103, 103 (1989). These regulations arose out of a joint proposal by the railroads and the National Association of Recycling Industries, Inc.