**MR. SPROUT, INC.; Tray Wrap, Incorporated; Country Wide Produce, Incorporated; G & T Terminal Packaging Co., Inc., Petitioners,**

v.

**UNITED STATES of America, and Interstate Commerce Commission, Respondents,**

**Consolidated Rail Corporation; Atchison, Topeka, and Santa Fe Railway Company, Intervenors.**

**No. 959, Docket 92–4160.**

United States Court of Appeals, Second Circuit.

Argued Feb. 11, 1993.

Decided Oct. 25, 1993.

Elkan Abramowitz, New York City (Christopher J. Gunther, Morvillo, Abramowitz, Grand, Iason & Silberberg, P.C., New York City, David J. Goldberg, Cohen, Shapiro, Polisher, Shiekman & Cohen, Lawrenceville, NJ, of counsel), for petitioners.

Craig M. Keats, Associate Gen. Counsel, I.C.C., Washington, DC (Louis Mackall, V. Robert S. Burk, Gen. Counsel, I.C.C., Washington, DC, J. Mark Gidley, Acting Asst. Atty. Gen., John J. Powers, III, John P. Fonte, Dept. of Justice, Washington, DC, of counsel), for respondents.

Jonathan M. Broder, Consolidated Rail Corp., Philadelphia, PA (Constance L. Abrams, Consolidated Rail Corp., Philadelphia, PA, Paul A. Cunningham, Robert M. Jenkins, III, Harkins Cunningham, Washington, DC, of counsel), for intervenor Consolidated Rail Corp.

Before: KEARSE, CARDAMONE and PIERCE, Circuit Judges.

CARDAMONE, Circuit Judge:

This appeal concerns the shipment of potatoes by rail into the New York City metropolitan area. A group of shippers blame the railroad for the fact that an appreciable amount of this product is received in unsaleable condition. Because potatoes are plentiful and a relatively inexpensive vegetable, a good many consumers have a decided attachment to them so that the demand for this produce is large. Not only are potatoes good to put in the mouth to eat, but the word "potatoes" itself is also, so Dickens tells us, like papa, prunes and prism—a "very good word[ ] for the lips." Charles Dickens, *Little Dorrit (Part Two)*, in 8 *The Works of Charles Dickens* 67 (Collier & Son ed. 1900).

However good in whatever way potatoes may be for the lips, the shipment of these vegetables has not proved in this case to be good for anyone's pocketbook. For over a decade the shippers have mounted such an intensive barrage of lawsuits and administrative proceedings against the railroad for damages on account of claimed spoilage that the railroad has imposed a surcharge on every shipment of potatoes destined for these particular shippers to cover its litigation expenses. This costly legal warfare culminated in a ruling by the Interstate Commerce Commission (ICC or Commission) in July 1992, from which this appeal has been taken, upholding the surcharge and further ruling that it lacked jurisdiction over the practices of the agencies charged with inspecting railroad cars for alleged spoilage to produce en route to shippers.

### BACKGROUND and PRIOR PROCEEDINGS

G & T Terminal Packaging Co., Mr. Sprout, Inc., Tray Wrap, Inc., and Country Wide Produce, Inc. (collectively petitioners, wholesalers, shippers, or G & T) are closely related produce wholesalers located at Kingsbridge, Bronx, New York. G & T, Mr. Sprout, and Tray Wrap are owned or directly controlled by one Anthony Spinale, and Country Wide is owned by Gary Speier, an employee of G & T and Tray Wrap. These potato wholesalers receive their product via the Consolidated Rail Corporation (Conrail), which carries potatoes grown in the western states to the east coast and into the wholesaler's Kingsbridge facilities. There the potatoes are repackaged for consumers and sold to retailers in the New York City metropolitan market. Conrail is the last link in a rail

carrier chain of railroads transporting this produce.

G & T and Conrail have had an acrimonious history. According to Conrail, petitioners in the early 1980s filed loss and damage claims—which compensate a receiver for economic losses from shipment delays or produce spoilage, see 49 U.S.C. § 11707(a)(1) (1988)—on nearly every carload of produce shipped to them. Conrail claims that the damages sought—$4.2 million in a pending lawsuit in the United States District Court for the Southern District of New York—are higher than those of all the other produce shippers served by the railroad combined. The ICC reports that historically about 6 percent of G & T's damage claims are paid. In addition to damage suits against Conrail, G & T has withheld payment on "demurrage and detention" charges which compensate the railroad for extra time the wholesaler takes in unloading the railcars.

As a response to all this claims activity, Conrail in May 1983 imposed a surcharge of over $500 on every railcar destined to the wholesalers' Kingsbridge facilities. This surcharge raised the shippers' cost of transporting a carload of potatoes from Idaho to the Bronx to $5,800. Conrail insists the surcharge merely covers the extra cost of defending against petitioners' damage claims. When G & T began receiving potato shipments in its nearby Hunts Point facility, Conrail imposed the same surcharge on the wholesaler at that location as well.

As a result of the surcharge petitioners filed suit against Conrail in March 1984 in New Jersey district court seeking to revoke the exemption from ICC regulation of the shipment of potatoes by rail. G & T says it went to court in reliance on an October 1983 letter from the ICC in which the Director of the Office of Proceedings stated that his agency no longer had jurisdiction over rate disputes with the deregulated railroads. In March 1986 the ICC formally reversed this position and asserted that it had exclusive jurisdiction where the challenged rates had been deregulated under 49 U.S.C. § 10505 (1988). The ICC's position was upheld by the Third Circuit and petitioners' common law claims against Conrail were dismissed.

See G. & T. Terminal Packaging Co. v. Consolidated Rail Corp., 830 F.2d 1230, 1233–36 (3d Cir.1987) (G & T I ), cert. denied, 485 U.S. 988, 108 S.Ct. 1291, 99 L.Ed.2d 501 (1988). The Third Circuit also held that the $500 plus surcharge did not violate the Interstate Commerce Act because a railroad could take the cost of damage claims into account when it set rail rates, id., at 1233, and dismissed G & T's constitutional due process claims because Conrail is not a state actor. Id., at 1236.

In addition to its dispute with Conrail over the surcharge and its many damage claims, the shippers contend that Conrail's inspection reports documenting the condition of produce upon arrival in New York are fraudulent. The challenged reports are prepared by several agencies—the Transportation Inspection Agency, Inc. (TIA) (formerly Railroad Perishable Inspection Agency or RPIA), and the Merchants Dispatch Transportation Corporation (MDT). MDT is a wholly-owned subsidiary of Conrail and TIA is controlled by a railroad association of which Conrail is a member. The wholesalers insist the agencies prepare false inspection reports because Conrail has instructed them to remove all language imputing blame to the railroad. Conrail points out that the inspectors are not employed to give their opinion as to blame, but simply to document facts, such as the temperature in a railcar and apparent produce spoilage. G & T has lost all of its several lawsuits on this issue in state and federal courts, and in G & T Terminal Packaging Co. v. Consolidated Rail Corp., 719 F.Supp. 153, 155–57 (S.D.N.Y.1989) (G & T II ), the district court dismissed petitioners' fraud claims on the grounds of res judicata and collateral estoppel.

The shippers filed a petition with the ICC against Conrail in July 1988 to reregulate the railroad's Kingsbridge and Hunts Point traffic. The complaint was amended a year later to add the Atchison, Topeka, and Santa Fe Railway Company, which ships russet potatoes from California. The amended claim raises issues identical to those against Conrail. In February 1991 an Administrative Law Judge (ALJ), acting for the ICC, recommended reregulation under 49 U.S.C.

§ 10505(d) (1988). The ALJ found that Conrail discriminated in its rating practices and had imposed its railcar surcharge to discourage the shippers from exercising their right to file damage claims. The ALJ also found that Conrail engaged in unreasonable practices in violation of 49 U.S.C. § 10701(a) (1988) by endorsing the disputed inspection reports.

On appeal, the Commission reversed the ALJ in an order and opinion entered July 24, 1992. The ICC held that Conrail did not have market power over these shippers, which is a prerequisite for reregulation. It also held that Conrail's surcharge was legitimate and that the shippers had failed to present a *prima facie* rate discrimination case under 49 U.S.C. § 10741 (1988). The ICC ruled it lacked "unreasonable practice jurisdiction" over the inspection agencies. It is from this order that petitioners appeal.

### REGULATORY BACKGROUND

In the Railroad Revitalization and Regulatory Reform Act of 1976 (4–R Act), Pub.L. No. 94–210, 90 Stat. 31 (1976), and the Staggers Rail Act of 1980 (Staggers Act), Pub.L. No. 96–448, 94 Stat. 1895 (1980), Congress directed the ICC to reduce its supervision of the railroad industry so that carrier rates and practices would be disciplined by market forces rather than government regulation. With these statutes, Congress gave the ICC authority to exempt categories of rail traffic from regulation where

(1) [it] is not necessary to carry out the transportation policy of section 10101a of this title; and

(2) either (A) the transaction or service is of limited scope, or (B) the application of a provision of this subtitle is not needed to protect shippers from the abuse of market power.

49 U.S.C. § 10505(a) (1988). Pursuant to that directive, the Commission exempted the movement of potatoes by rail from regulation in April 1980.

Once the ICC has decided to exempt a rail carrier from regulation, it retains the power to revoke that exemption, or reregulate the railroad, under 49 U.S.C. § 10505(d). The standards for revocation proceedings are set forth in § 10101a, which identifies the government's policy goals with respect to the nation's railroads, such as fair and competitive pricing, safety and minimal regulation. *Id.* § 10101a. G & T's petition before the ICC was a request under § 10505(d) to reregulate Conrail's potato traffic.

On appeal petitioners raise three issues: (1) was the finding by the ICC that Conrail lacked market power correct; (2) was Conrail's surcharge discriminatory; (3) did the ICC have jurisdiction over the claim that the rail inspection reports constituted an unreasonable practice by Conrail. Following petitioners' lead, we recognize that the first two issues apply equally to Santa Fe, though the factual circumstances differ slightly. Our resolution of these issues therefore embraces Santa Fe as well as Conrail.

### DISCUSSION

#### I Standards of Review

■ Before undertaking an analysis of the merits, we comment briefly on issues of jurisdiction and our scope of review. The ICC has jurisdiction over a proceeding that seeks to revoke an exemption from its regulation of rail carrier transportation according to 49 U.S.C. § 10505(d) (1988). We have appellate jurisdiction over the ICC's final order denying petitioners' application for reregulation under 28 U.S.C. § 2342(5) (1988). The ICC order, which disposed of all claims with respect to all parties, became final when entered on July 24, 1992. 49 U.S.C. § 10327(i) (1988). On September 18, 1992 the shippers filed a timely petition for review. *See* 28 U.S.C. § 2344 (1988). Because the shippers have their principal offices in New York State, venue is proper in this Circuit pursuant to 28 U.S.C. § 2343 (1988).

■ The Commission's interpretation and application of the exemption provision that it administers is entitled to the same deferential standard of review as that afforded to other agency proceedings. *See Chevron U.S.A., Inc. v. Natural Resources Defense Council, Inc.,* 467 U.S. 837, 842–45, 104 S.Ct. 2778, 2781–83, 81 L.Ed.2d 694 (1984); *Central States Motor Freight Bureau, Inc. v.*

*ICC,* 924 F.2d 1099, 1102 (D.C.Cir.), *cert. denied,* —— U.S. ——, 112 S.Ct. 87, 116 L.Ed.2d 59 (1991); *Niagara Frontier Tariff Bureau, Inc. v. United States,* 826 F.2d 1186, 1190–91 (2d Cir.1987); *Brae Corp. v. United States,* 740 F.2d 1023, 1038–39 (D.C.Cir. 1984), *cert. denied,* 471 U.S. 1069, 105 S.Ct. 2149, 85 L.Ed.2d 505 (1985). Under the Administrative Procedure Act, 5 U.S.C. § 706(2) (1988) (APA), we may reverse the Commission's decision only if it is not supported by substantial evidence or is arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law. *See Connecticut Trust for Historic Preservation v. ICC,* 841 F.2d 479, 481–82 (2d Cir.1988). The fact that the ICC's decision reversed an ALJ's ruling does not alter the deference standard. *See Marshall Durbin Food Corp. v. ICC,* 959 F.2d 915, 920–21 (11th Cir.1992). Rather, under the APA, all issues raised by a party's administrative appeal of an ALJ's initial decision are considered *de novo* by the Commission, *see* 5 U.S.C. § 557(b) (1988); *see also Containerfreight Transp. Co. v. ICC,* 651 F.2d 668, 670 (9th Cir.1981) (per curiam), and our review is directed at the final conclusion of the Commission itself.

## II  Market Power

██ With that discussion of threshold matters, we turn to an analysis of the three issues before us. The Commission properly found the initial inquiry in a reregulation case is whether the carrier has market power. Conrail delivers russet potatoes originating in various states, including Idaho. It is the only rail carrier delivering Idaho potatoes into New York City. Santa Fe, by contrast, originates shipments of russet potatoes in western states *other than* Idaho. Conrail noted that it faced competition from truckers delivering russets from states such as Maine and Michigan. The shippers sought to demonstrate Conrail's market power by showing that the Idaho russet potato is unique, and that hence (at least as to Idahos) it was irrelevant whether other russet potatoes can be trucked to New York from Maine and Michigan.

On the basis of interviews with buyers at various retail grocery chains, including A & P, Wakefern and Grand Union, a Conrail witness testified that Idaho russets were generally interchangeable with other types of russets. By contrast, a wholesaler witness stated that in his experience Idaho russets are unique and that—at least as to the Idaho potatoes that were surcharged—Conrail had market power. The Commission recognized that questions such as product substitutability and transportation alternatives were relevant in assessing the rail carriers' market power, but it focused instead on a third criterion that the ALJ had ignored—Conrail's rates—to see if the carrier's pricing behavior was that of a business with market power.

The Commission concluded that Conrail's pricing patterns revealed a lack of substantial market power. It arrived at this result by reviewing Conrail's 1990 cost study, which it found thorough, reasonable and essentially unrebutted. That study showed, *inter alia,* that under a scenario most favorable to the wholesalers—including revenues from the surcharge while excluding legal costs and the cost of paid damage claims—Conrail's revenues on petitioners' potato traffic exceeded its variable costs by no more than 17 percent in 1987 and 13 percent in 1988. The Commission also considered Conrail's undisputed evidence that even with the surcharge, the inflation-adjusted rail rate paid by the shippers actually decreased 24 percent while the exemption was in effect. These figures, concluded the Commission, "indicate[ ] a *very* competitive market for *all* western potatoes, regardless of whether or not Idaho potatoes represent a unique market."

Petitioners do not now seriously challenge the validity of the evidence on which the Commission based its conclusion. Instead, they raise three arguments regarding the Commission's rulings: (1) its use of low revenue-to-variable cost ratios to establish a lack of market power was inappropriate and contrary to precedent; (2) it did not explain why the "profits" Conrail earned are inadequate; and (3) its reliance on "theoretical" indicia of market power such as revenue-to-cost calculations is contrary to *Eastman Kodak Co. v. Image Technical Servs., Inc.,* —— U.S. ——, ——, 112 S.Ct. 2072, 2082, 119 L.Ed.2d 265

(1992). We address each of these arguments in turn.

First, revenue-to-cost ratios have been employed by the Commission, the courts, and Congress as a valid and reliable measure of market power in the rail industry. In *Rail General Exemption Authority–Lumber or Wood Products*, 7 I.C.C.2d 673, 676 (1991), for example, the ICC exempted from regulation rail transportation of various lumber and wood products. It did so after finding that the rail carrier lacked market power to warrant regulation, a determination that was based in part on the low revenue-to-variable cost ratios and the declining earnings for carriers in this area. Similarly in *Exemption from Regulation–Boxcar Traffic*, 367 I.C.C. 424, 435–440 (1983), the Commission relied on low revenue-to-variable cost ratios as a factor to establish the absence of market power in granting the boxcar exemption in the first place. The Commission's decision in this case—and indirectly its use of cost and revenue ratios—was affirmed in relevant part by the D.C. Circuit in *Brae Corp.*, 740 F.2d at 1037, 1042–43. *See also Coal Exporters Assn. v. United States*, 745 F.2d 76, 96–97 (D.C.Cir.1984), *cert. denied*, 471 U.S. 1072, 105 S.Ct. 2151, 85 L.Ed.2d 507 (1985).

Congress itself has recognized that revenue-to-variable cost ratios can be indicative of market power. In the 4–R Act and the Staggers Act Congress provided that maximum rate regulation by the Commission is inappropriate except to the extent that a carrier has "market dominance" over the traffic at issue. 49 U.S.C. § 10701a(b)(1) (1988). Market dominance, defined in § 10709(a) as "an absence of effective competition from other carriers or modes of transportation for the transportation to which a rate applies," is a form of market power. Congress expressly provided that ratios of revenue-to-variable costs in the range from 160 to 180 percent, depending on the rate's time span, are acceptable and do not indicate market dominance. *See id.* § 10709(d)(2). Employing this statute as a general guideline, we are satisfied that the ICC's use of Conrail's 117 percent ratio as one compelling sign of the carrier's lack of market power was neither unwarranted, nor arbitrary and

capricious under APA § 706. *See* 5 U.S.C. § 706(2) (1988).

Petitioners make the further argument that, even if the Commission was within its discretion in relying on cost ratios as one factor in the market power analysis, the Commission abused its discretion in relying on such ratios as the "threshold question." We disagree. While we believe that other more "subjective" factors are often important in market power determinations, *see, e.g., International Distribution Ctrs., Inc. v. Walsh Trucking Co.*, 812 F.2d 786, 792 (2d Cir.) (in antitrust context, listing factors relevant to market power inquiry), *cert. denied*, 482 U.S. 915, 107 S.Ct. 3188, 96 L.Ed.2d 676 (1987), with respect to an analysis of market power in the railroad industry, we decline to hold that the ICC abused its discretion in using cost ratios in its threshold inquiry.

As to petitioners' second point, in the rail industry, rates barely returning variable costs tend to indicate a competitive, not a captive, market. The rail industry is characterized by heavy fixed costs, *see Coal Rate Guidelines, Nationwide*, 1 I.C.C.2d 520, 529 (1985), *aff'd sub nom. Consolidated Rail Corp. v. United States*, 812 F.2d 1444 (3d Cir.1987), and the Commission has calculated, in the context of limiting rates on recyclables, that the average revenue-to-variable cost level that would permit the industry as a whole to recover its fully allocated costs, including its cost of capital, range from 140 to 160 percent. For the most part the ratio is about 146 percent. *See CSX Transp., Inc. v. ICC*, 952 F.2d 500, 502 (D.C.Cir.1992).

But because of competitive constraints, a good deal of traffic is lost by the railroads to the trucking and maritime shipping industries at those levels. Accordingly, Congress in the Staggers Act recognized that railroads must engage in "differential pricing." Such pricing involves charging above fully allocated costs for *captive* traffic in order to be able to continue carrying *competitive* traffic at levels much closer to variable costs. *See* H.R.Rep. No. 1035, 96th Cong., 2d Sess. 39 (1980), *reprinted in* 1980 U.S.C.C.A.N. 3978, 3984–85; *see also* S.Rep. No. 470, 96th Cong., 1st Sess. 7 (1980). Railroads must charge above fully allocated costs on captive traffic if

they are to achieve revenue adequacy and stay in business. *See Potomac Elec. Power Co. v. ICC*, 744 F.2d 185, 193 (D.C.Cir.1984).

In this context, petitioners' assertion that the Commission did not explain why 13 and 17 percent are not reasonable "profit" margins misses the point. Rates returning 13 to 17 percent above variable costs are not really profits, for they do not fully cover costs. Given that fact, the Commission acted rationally in finding a lack of market power where revenues barely cover variable costs. No further explanations of the inadequacy of the rail carrier's profits were necessary.

Third, petitioners declare the Commission's reliance on carrier pricing behavior to determine market power is inconsistent with *Eastman Kodak Co.*, — U.S. at —, 112 S.Ct. at 2072, a 1992 Sherman Act case involving an alleged tying arrangement. In that case, Kodak was denied summary judgment when it relied purely on an economic theory, and not on actual market data, for the proposition that a lack of market power over equipment sales in the primary market demonstrated a lack of market power over replacement parts sales in the tied market. The Supreme Court ruled that under those circumstances, summary judgment on the sole basis of an economic theory was inappropriate: "[C]ontrary to Kodak's assertion, there is no immutable physical law—no 'basic economic reality'—insisting that competition in the equipment market cannot coexist with market power in the aftermarkets." *Id.*, at —, 112 S.Ct. at 2084. *Eastman Kodak* is plainly inapposite to this case; cost-revenue ratios are not based on theories of interrelationships between two markets but on factual data. Thus, contrary to petitioners' claim, the ICC did not substitute economic theory for economic reality. Rather, the Commission, after extensive factfinding, relied on Conrail's persuasive cost data, which was the most concrete and least theoretical evidence of market power presented. We cannot conclude that was arbitrary, capricious or in contravention of the law.

## III  Discrimination

■  To provide an independent basis for reregulation, petitioners declare the Commis-

sion should have found that Conrail's surcharge was unreasonably discriminatory. "Unreasonable discrimination" occurs when a railroad exacts different rates for (1) "performing a like and contemporaneous service," (2) "in the transportation of a like kind of traffic," (3) "under substantially similar circumstances." 49 U.S.C. § 10741(a) (1988). A party alleging discrimination must demonstrate that each of these elements is satisfied, and that the rate disparity causes it to suffer a competitive disadvantage. In addition, discrimination cannot exist between different routes. *See* § 10741(f). Finally, a challenging party must rebut any showing by the carrier that the disparity is occasioned by differences in transportation conditions, including the cost of providing service. *See Dresser Indus. v. ICC*, 714 F.2d 588, 598 (5th Cir.1983); *Nueces County Navigation Dist. No. 1 v. ICC*, 674 F.2d 1055, 1060 (5th Cir.), *cert. denied*, 459 U.S. 1035, 103 S.Ct. 446, 74 L.Ed.2d 601 (1982); *Harborlite Corp. v. ICC*, 613 F.2d 1088, 1091–92 (D.C.Cir.1979). The shippers failed to present a *prima facie* case of discrimination under § 10741, and even if they had, we believe the Commission's finding that. any rate difference was warranted by the varying transportation conditions was justified.

Petitioners submitted no evidence about who their competitors are, which rail lines their competitors are on, what their competitors sell and which markets they serve, what carriers their competitors use, or what rates their competitors paid. Nor did the wholesalers present any evidence that the sales to retailers they served suffered because their rates prejudiced them *vis-a-vis* competitors. Hence, petitioners did not make out a *prima facie* case.

### A.  Competitive Injury

■  We address first the statutory elements of rate discrimination. The shippers insist they identified their competitors before the Commission as three potato repackers at Hunts Point Market: Fierman Produce, Havana Potatoes, and Jacobson Potatoes. But the names of these businesses appeared only in response to interrogatories filed by Conrail asking what produce dealers petitioners

were aware of at various locations. The way in which these competitors affected petitioners' business was not offered as part of petitioners' proof, nor did petitioners demonstrate that they compete with these companies to provide potatoes (Idahos or other russets) to particular retailers. Without this information the Commission was unable to make a finding that the same carriers served the unnamed competitors or that an alleged rate differential caused competitive harm to the subject shippers.

G & T further posited that competitive harm can be deduced from a drop in rail shipments from 1983—when the surcharge was imposed—to 1984, but the Commission noted that rail shipments of potatoes were unusually high in 1983 and returned to historic levels in 1984. In fact, the Commission found potato deliveries in the last part of 1983 and first half of 1984 to be "well above" 1982 levels. Moreover, the ICC found no competitive injury even if rail shipments did drop, inasmuch as five of G & T's seven largest customers, representing 83 percent of its total business, bought more potatoes from petitioners in 1984 than in either 1983 or 1982. Regardless of where petitioners obtained their potatoes, or the delivered price they paid for them, their business apparently did not suffer, and accordingly, especially in light of their failure to show what rates their competitors paid the Commission's finding that petitioners did not show competitive harm as required by 49 U.S.C. § 10741(f) (1988) was not arbitrary or capricious.

■ G & T next argues that the Commission erred because it did not recognize that only "potential" for competitive injury need be shown. *Cf. State of N.Y. v. United States,* 568 F.2d 887, 898 (2d Cir.1977); *Harborlite Corp.,* 613 F.2d at 1091. The ICC, contrary to petitioners' contention, did not suggest that G & T had to prove a precise level of competitive harm. But given the dearth of evidence, the ICC had no basis for finding potential injury to the wholesalers. Potential injury cannot be purely chimerical; rather, it must be grounded in facts indicating a real possibility of competitive harm. No such facts have been advanced.

B. *No Unlawful Discrimination Between Rates Applicable Over Different Routes*

■ Concerned that even the legislative hurdles of showing different rates for a like service under similar circumstances would be insufficient to prevent shippers from disputing justified rate differentials, Congress in 1980 said that § 10741(a)'s prohibition against unlawful discrimination "shall not apply" to "rail rates applicable to different routes." 49 U.S.C. § 10741(f)(4) (1988); *see also* H.R.Rep. No. 1430, 96th Cong., 2d Sess. 104 (1980), *reprinted in* 1980 U.S.C.C.A.N. 4110, 4136. The ICC summarized the record on this point succinctly:

[P]etitioners ... indicate that their primary point of receipt was at Kingsbridge, while the rates that they seemed to complain about applied to other points in the New York City area, such as Hunts Point, Mt. Kisco, and Mt. Vernon.... [H]owever, ... these four points are separate destinations located on different rail lines. Mt. Kisco lies far to the north in Westchester County, Hunts Point is ... in the Bronx, Mt. Vernon lies north of the Bronx, and Kingsbridge is on a different line....

Hence, the Commission properly found that petitioners did not meet the "same route" requirements of § 10741(f).

C. *Rate Differential as a Reflection of Costs*

■ The law has been settled for nearly a century that if it costs more to serve one customer than another, the statutory requirement of "substantially similar circumstances" is not met. It also is settled that rail carriers may consider their loss and damage experience in calculating those costs, that is, a carrier is not prohibited by § 11707 from taking those costs into account when it fixes its rates. *See G & T I,* 830 F.2d at 1233.

Even had petitioners made out a *prima facie* case, their discrimination claim would fail because Conrail's unrebutted cost study shows that the additional cost of serving G & T justifies any rate disparity that may exist. The shippers conceded that Conrail's freight handling practices are the same for them as

they are for other potato shippers, and that the damage their freight suffers is neither more nor less than the damage suffered by Conrail's other potato receivers.

G & T does not directly dispute the basic legal proposition that loss and damage experience is a relevant consideration in carrier ratemaking. *See* 49 U.S.C. § 10505(e) (1988); *G & T I*, 830 F.2d at 1233. Rather, taking the posture that the damage claims they make are valid, the shippers aver that allowing Conrail to reflect costs of these loss and damage claims in the rates punishes them for their special vigilance in standing up for their rights and would intimidate other shippers so that they will be afraid to exercise their rights. This view is simply another version of the argument—which has been rejected by other courts, *see G & T I*, 830 F.2d at 1233; *G & T Terminal Packaging Co. v. Consolidated Rail Corp.*, 646 F.Supp. 511, 520 (D.N.J.1986)—that Conrail's surcharge deprives the wholesalers of their statutory right to file claims. We see no reason to depart from the prior cases to adopt the shippers' position.

The shippers further suggest that Conrail be required to spread the loss and damage costs occasioned by its traffic among the other shippers it serves. But the Staggers Act, with its emphasis on allowing rail carriers the flexibility to price their services based on their costs and competitive considerations, discourages cross-subsidization among shippers. *See* 49 U.S.C. § 10101a (1988) (rail transportation policy). And, as the Commission noted, railroad accounting principles generally provide that costs should be recovered from the party that generates them. The cost averaging approach that petitioners advocate would relieve them of the responsibility for the costs they generate by shifting those costs to the traffic of shippers that handle their claims practices in a different manner. This would not only unfairly penalize those shippers, but also hinder the ability of the railroads to offer them competitive rates.

## IV ICC Jurisdiction Over Unreasonable Practices

### A. *Parties' Contentions*

G & T's final argument for reversal is predicated on its belief that the ICC should exercise its "unreasonable practice" jurisdiction to remedy Conrail's endorsing of slanted inspection reports. The shipper says the ICC should have affirmed the ALJ's finding that Conrail's continued use (and alleged endorsement) of what it knew to be a fraudulent practice by TIA and MDT constituted an "unreasonable practice" within the meaning of 49 U.S.C. § 10701(a) (1988). The Commission conceded that petitioners presented evidence that the inspection agencies slanted reports in the railroad's favor. A number of inspectors testified that reports often had to be rewritten using certain terminology improperly shifting blame for damage away from the railroad, because "the railroad wants it done this way." Petitioners frequently called Conrail's attention to what the inspectors were doing. Yet, the ICC ruled that its jurisdiction to remedy "unreasonable practices" by a railroad did not extend to freight inspections. It reasoned that it would be stretching its jurisdiction to say that, because Conrail may have known about the inspection agencies' reporting practices, it committed an unreasonable practice by adding to the cost of the inspection process or by raising its rates.

Conrail's response to petitioners' assertion of Commission jurisdiction is that the ICC always has recognized that it has no jurisdiction to adjudicate loss and damage claims, whether framed as fraud claims or otherwise. *See Ex Parte No. 263: Rules, Regulations, and Practices of Regulated Carriers with Respect to the Processing of Loss and Damage Claims*, 340 I.C.C. 515, 539–40 (1972) (*Loss and Damage Claims*). It concedes the ICC has authority to issue rules governing the efficient processing of loss and damage claims and that the agency has done so, *see* 49 C.F.R. § 1005.1 (1992), but Conrail argues that the petitioners do not claim that it has violated any of those rules. Further, Conrail continues, G & T's damage claims have been adjudicated in three separate court actions it brought asserting that TIA and MDT had forced their inspectors to structure or rewrite their inspection reports in an effort fraudulently to reduce Conrail's legal obligations to pay any freight loss and damage claims. But the courts found the

wholesalers were unable to point to a single illustration of impropriety or to any particular report that had been fraudulently altered.

Conrail notes that for 50 years TIA has acted as agent for virtually all of the nation's railroads in inspecting perishables for loss and damage. The inspections performed by TIA are for the exclusive benefit of its railroad carrier principals. Thus, reports are limited to the facts, and Conrail asserts that they may not include unwarranted and unintended admissions of liability. MDT's job is to inspect and repair the refrigeration units of railcars used for perishables, as agent for Conrail and other railroads. It performs mechanical duties only, and its inspectors are not authorized to make any assessments of damaged lading.

The ICC rightly noted, Conrail avers, that petitioners did not even claim, much less demonstrate, that they had relied on a railroad inspection report to their detriment. The shippers appear to concede that they were not misled by the inspection reports. Conrail did not make the inspection reports the sole basis for determining liability, as the ICC noted.

Conrail's argument concludes that even if the traffic were regulated and the ICC had found an "unreasonable practice," that finding could not have had any impact on Conrail's rates because the Act expressly forbids the ICC to use a finding of an unreasonable *practice* to limit "directly or indirectly" a rail carrier's *rates*. *See* 49 U.S.C. § 10707a(h) (1988). Thus, it believes the ICC's ultimate conclusion—refusing to revoke the exemption on the basis of unreasonable practices with respect to the inspection agencies—was amply supported by the record.

### B. *ICC Ruling on this Issue*

When this issue was presented to the Commission it concluded when rates have not been shown to be unlawful, it may not use its "unreasonable practice" authority as an indirect means of limiting rates that carriers are otherwise authorized to charge under the statute. *See* 49 U.S.C. § 10707a(h) (1988). It reasoned that it may not interfere with a rail carrier's ratemaking discretion unless a carrier's rates or practices violate a particu-

lar provision of the Act, 49 U.S.C. § 10701a (1988). And, in § 10505(e), Congress directed that the ICC may not use the requirements of 49 U.S.C. § 11707 (1988), pertaining to loss and damage, as grounds for requiring carriers to maintain a particular rate level. In rejecting the ALJ's ruling in this respect, the ICC stated: "The type of activity here, freight inspections, is not a rate or tariff practice that the Commission has traditionally considered in the context of our unreasonable practice jurisdiction." The Commission accordingly ruled that its "unreasonable practice" jurisdiction did not extend to inspection activities.

### C. *Analysis of ICC's Ruling*

We think the claims inspection practices of carriers fit well within the ICC's longstanding interpretation of its jurisdiction to regulate claims processing. In *Loss and Damage Claims*, 340 I.C.C. at 540–43, the agency established the extent of its "unreasonable practice" jurisdiction with regard to matters relating to loss and damage claims against regulated carriers. There the ICC said:

> We have the undoubted authority to insure that regulated carriers establish reasonable regulations and practices related to their transportation services. It necessarily must follow that we have the jurisdiction and the power to establish regulations pertaining to the *processing* of loss and damage claims, even though no such authority may be specified in the act, if the processing of loss and damage claims is included in those transportation services concerning which carriers have an affirmative duty, under the statute, to establish reasonable regulations and practices. The same result logically must ensue if we find, upon a proper record, that the efficient and expeditious processing of loss and damage claims will further our implementation and effectuation of the national transportation policy.

*Id.* at 543.

This rationale remains compelling. In *Loss and Damage Claims* the ICC relied on the fact that carriers' reasonable practices for processing claims furthered two aspects

of national transportation policy: promoting an efficient transportation system and preventing discrimination. *See* 340 I.C.C. at 530 n. 9. These same two goals are at least equally as critical today, as evidenced by their enactment as part of the National Rail Transportation Policy. *See* 49 § 10101a(10) (1988) (policy "to encourage honest and efficient management of railroads"); *id.* § 10101a(13) (policy "to prohibit ... unlawful discrimination"). Further, *Loss and Damage Claims* establishes the ICC's authority to promulgate regulations regarding carrier's procedures for processing loss and damage claims. *See* 340 I.C.C. at 543 ("we have the jurisdiction and the power to establish regulations pertaining to the *processing* of loss and damage claims"). In particular, the ICC emphasized the need to regulate the investigation of such claims. *See id.* at 544–45. In accordance with this decision the ICC has, in fact, issued regulations that prescribe principles and practices for investigation and voluntary disposition of loss and damage claims. *See* 49 C.F.R. Part 1005 (1992).

■ When the Commission departs from its own settled precedent, as here, it must present a "reasoned analysis" that justifies its change of interpretation so as to permit judicial review of its new policies. *See Rust v. Sullivan,* 500 U.S. 173, ——, 111 S.Ct. 1759, 1769, 114 L.Ed.2d 233 (1991). The reviewing court must be able to understand the basis of the agency's action so that it may judge the consistency of that action with the agency's mandate. *See Atchison, Topeka & Santa Fe Ry. Co. v. Wichita Bd. of Trade,* 412 U.S. 800, 808, 93 S.Ct. 2367, 2375, 37 L.Ed.2d 350 (1973) (Marshall, J.). That new interpretation—once explained with reasoned analysis—is still entitled to deference under the standard of *Chevron. See Rust,* 500 U.S. at ——, 111 S.Ct. at 1769.

■ The ICC's attempts to explain its disavowal of jurisdiction do not meet this standard. The Commission commences with the unfounded assertion that various provisions of the Interstate Commerce Act would have prevented it from granting an effective remedy even had it exercised jurisdiction. It insists that 49 U.S.C. §§ 10505(e) and 11707 (1988) somehow limit its revocation authority

with respect to freight claim practices. We think this an arbitrary view because in the past the ICC has expressly rejected the notion that these carrier liability provisions of the Staggers Act diminish its authority to revoke regulatory exemptions. For example, in 1981 the Commission noted:

If concrete problems arise with respect to carrier loss and damage practices, we would, of course, accept petitions to amend in an appropriate manner the exemption given [trailer on flat car and container of flat car] traffic. Because 49 U.S.C. § 10505(d) explicitly also grants us the authority to revoke an exemption in whole or in part, we can and will protect the legitimate interests of shippers, carriers, and the public in general.

*Ex Parte No. 230 (Sub No. 5),* 46 Fed.Reg. 32,257 (1981). The reason for the divergence from this past position is not articulated.

The ICC held that it had no jurisdiction to resolve this claim because the inspection reports are used as substantive evidence to decide damage claims, and damage claims are within the courts' jurisdiction. Putting aside the substance of the reports and the merits of damage claims, the ICC has jurisdiction over the way in which damage claims are made, and inspection reports clearly are relevant to a damage claim. Petitioners contend the reports are fraudulent because Conrail instructed their authors not to report on the cause of freight damage. Thus, such a claim deals with inspection report preparation and procedure, an area where the ICC has jurisdiction to decide whether Conrail's conduct is an unreasonable practice. On remand, the ICC must exercise its jurisdiction and resolve the issue of whether the inspection reports are fraudulent. What remedy the Commission imposes, were it to so find, is a matter confided to that agency's discretion.

## CONCLUSION

Petitioners' appeal from the ICC order is accordingly affirmed, in part, and reversed, in part, and remanded to the Commission for

further proceedings consistent with this opinion.